The CITY OF SPRINGFIELD, a municipal corporation, acting By and Through the SPRINGFIELD UTILITY BOARD, Plaintiff,

v.

WASHINGTON PUBLIC POWER SUPPLY SYSTEM, a Washington municipal corporation; City of Eugene, Bonneville Power Administration, an agency of the United States Government; Peter Johnson, Administrator of the Bonneville Power Administration, et al., Defendants.

Civ. No. 82–1387–RE.

United States District Court, D. Oregon.

April 27, 1983.

---

Peter R. Mersereau, Rankin, McMurry, VavRosky & Doherty, Charles H. Turner, U.S. Atty., Jack G. Collins, Thomas C. Lee, Asst. U.S. Attys., Portland, Or., Paul A. Gaukler, Civ. Div., Dept. of Justice, Washington, D.C., Douglas M. Ragen, John F. Neupert, William H. Walters, Miller, Nash, Yerke, Wiener & Hager, Portland, Or., Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern, Tacoma, Wash., James H. Clarke, Edwin A. Harnden, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Thomas S. Moore, Stephen S. Walters, Stoel, Rives, Boley, Fraser & Wyse, William F. Martson, Jr., Tonkon, Torp, Galen, Booth & Marmaduke, Jay T. Waldron, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., Robert L. Ackerman, Springfield, Or., Frank H. Hilton, Jr., Schwab & Hilton, Robert M. Kerr, William G. Sheridan, Jr., Tooze, Kerr, Marshall & Shenker, Donald J. Lukes, Brophy & Lukes, Portland, Or., John D. Lowery, Gordon Wilcox, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., Liaison Counsel.

REDDEN, District Judge:

This action concerns three nuclear power plants whose construction was financed un-

der the terms of net billing agreements between the Bonneville Power Administration (BPA), Washington Public Power Supply System (WPPSS), and more than one hundred utilities in Oregon, Washington, Idaho, Montana, Nevada and Wyoming. The plants, known as WPPSS plants 1, 2 and 3, face a somewhat uncertain future. Two other such plants, WPPSS plants 4 and 5, have been terminated in mid-construction, and work has ceased on one of these three plants.

WPPSS plants 1, 2 and 3 share a significant characteristic distinguishing them from WPPSS plants 4 and 5: BPA is a signatory to the contracts governing the financing of their construction. BPA, a federal agency, has assumed the key role in financing the plants through the mechanism of net billing agreements.

In this action, plaintiff City of Springfield, Oregon, seeks a declaration that it had authority to enter into the net billing agreements. The federal defendants, including BPA, seek a further declaration that *all* participants had authority to enter into the agreements under their respective state laws. The parties now move for summary judgment.

In deciding these motions, I will address several issues. First, I must decide whether this case presents a justiciable controversy. Second, I must decide whether abstention is appropriate and third, I must decide what law governs the interpretation of the net billing agreements. Finally, I must decide the merits of the motions for summary judgment. These issues interrelate significantly and it is appropriate to summarize the background and history of this litigation.

## BACKGROUND TO THIS LITIGATION AND ITS PROCEDURAL HISTORY

BPA was established in 1937 with the purpose of developing the Northwest's hydroelectric resources and providing low cost energy to the region. In 1966, forecasts of a rapid growth in the power needs of the Northwest caused BPA to urge the construction of nuclear power plants to fill the projected shortfall in the region's energy needs. Between 1970 and 1973 BPA, its customers and WPPSS executed a series of contracts, called net billing agreements, providing for the construction of the nuclear plants. In 1976, WPPSS commenced construction of two more nuclear plants, WPPSS plants 4 and 5. BPA did not participate in those projects, although 88 Northwest utilities did join WPPSS in "participation agreements" for plants 4 and 5.

The predicted sharp growth in Northwest energy demands failed to materialize. As a result, the region faces the prospect of bond payments for the construction of plants which may never generate saleable power. Litigation, however, has certainly been generated, and pends in several state courts, as well as in this court. Meanwhile, WPPSS faces the prospect of a financial meltdown.

In *DeFazio, et al. v. Washington Public Power Supply System,* Lane County Circuit Court No. 16–81–11344, ratepayers of the city of Springfield challenged the authority of their city to enter into the participation agreements underlying dormant WPPSS plants 4 and 5. The ratepayers secured a ruling that forbade Oregon public utilities, including Springfield, from paying WPPSS in order to retire the debt created by plants 4 and 5. The Lane County Circuit Court ruled that, in entering into the participation agreements without a public vote, the Oregon participants had violated provisions of the Oregon Constitution and various statutes forbidding municipalities from incurring debt without voter approval. *DeFazio,* now on appeal, sent a shockwave through the Northwest and the municipal bond markets, because it held that Oregon utilities were not liable for the indebtedness for WPPSS plants 4 and 5 and raised the possibility that WPPSS would default on the bonds.

Other litigation, filed in this court, sought a ruling to the effect that *DeFazio* was wrongly decided and has been dismissed on abstention grounds. That suit, *Chemical Bank v. City of Bandon, et al.,* 562 F.Supp. 704 (D.Or.1983), concerned WPPSS plants 4 and 5, in which BPA owns no interest.

This suit, by contrast, concerns WPPSS plants 1, 2 and 3, in which BPA does have a crucial role. It is argued that BPA has in fact assumed the "dry-hole" risk as to these plants, that is, the obligation of payment if the plants are never completed or never produce saleable power. Thus, it is argued, the utilities which entered into net billing agreements will not be required to retire debts through the use of their taxing power or general revenue, and this, it is further argued, distinguishes *DeFazio*. Moreover, the federal involvement in these plants, and the prospect of federal responsibility if the "dry-hole" risk comes to fruition, arguably requires that *federal* law, not the law of Oregon or any other state, govern these contracts. *See Clearfield Trust v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *City of Springfield v. WPPSS, et al.*, 564 F.Supp. 86, (Opinion on motions to dismiss filed March 15, 1983), at n. 2.

A preliminary issue, however, is whether this case is in fact justiciable, and whether abstention is appropriate in deference to the pending appeal of *DeFazio*. I address these matters first.

## THIS SUIT IS JUSTICIABLE; ABSTENTION IS NOT APPROPRIATE

When this suit was originally filed, some parties moved to dismiss on the grounds that there was no "case or controversy" concerning the net billing agreements, or that the controversy was not justiciable because the parties to this suit did not have adverse interests. I reserved decision on this issue until litigation of the summary judgment motions on the merits. *City of Springfield, supra* (Opinion on motions to dismiss).

Since the time of the original argument of those motions some parties have altered their positions and others have entered this suit. At the present time it is clear that, far from being a case in which all parties "desire precisely the same result," *see Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 48, 91 S.Ct. 1292, 1293, 28 L.Ed.2d 590 (1971), this is a case in which unanimity on *any* issue is lacking. Some parties argue that the net billing agreements are markedly different in effect from the participation agreements invalidated by *DeFazio*. Other parties take the opposite position, arguing that the net billing agreements are identical, in effect, with the participation agreements, and therefore either *DeFazio* was correctly decided and the net billing agreements are invalid or *DeFazio* was "aberrational," and Oregon utilities did have authority to enter into both kinds of agreements. While some parties argue that federal law governs this case as a result of the federal involvement, others argue that federal law is inapplicable. Some parties argue that abstention is appropriate, others disagree. I conclude that I am faced with a real and justiciable controversy between litigants having adverse interests and asserting adverse positions.

A more difficult issue is the question of abstention. I must start from the axiom that a federal court has the general duty to decide a case properly before it, subject only to certain limited exceptions. *Knudsen Corp. v. Nevada State Dairy Commission*, 676 F.2d 374, 376–378 (9th Cir. 1982). I conclude that this suit is not appropriate for abstention because it does not require a ruling on possibly doubtful state law issues, and is governed by federal law, *see infra*. Nor does this case present issues of Constitutional law which could be avoided by a decision on state law issues, nor is this controversy confined exclusively to a special state administrative or judicial body with special expertise. Nor is a state suit pending which would grant the relief sought by plaintiff. *See Knudsen, supra* at 377–378; *cf. Chemical Bank v. City of Bandon, supra*. I therefore decline the invitation to abstain.

## THIS CASE IS GOVERNED BY FEDERAL COMMON LAW

I find that, because BPA, a federal agency, has assumed the "dry-hole" liability as to WPPSS plants 1, 2, and 3, the net billing agreements are contracts with the federal government whose interpreta-

tion is a matter of federal, not state concern. The federal involvement in these projects is certainly extensive. BPA has already "net-billed" more than $1 billion as part of the program for the construction of these plants. BPA admits it is liable for an additional $6 billion to retire the bonds sold to finance the project. Federal Defendants' Reply Brief at 6. BPA's pursuit of the construction of these plants has repeatedly been affirmed by Congress. *See* Public Law 91–439, 91st Cong., H.R. 18127 (October 7, 1970), 84 Stat. 890; H.R.Rep. No. 1219, 91st Cong., 2nd Sess. (1970), at 90; *see also* 16 U.S.C. § 839a (Supp. V) *et seq.* (1980), the Pacific Northwest Electric Power Planning and Conservation Act, *and see also Central Lincoln People's Utility District v. Johnson,* 686 F.2d 708 (9th Cir.1982), *cert. granted,* ——. U.S. ——, 103 S.Ct. 1496, 75 L.Ed.2d 928 (1983). Clearly, there is substantial federal interest in the interpretation of the net billing agreements undertaken by BPA to carry out this program.

This program is necessarily one which involves utilities throughout BPA's multi-state service area. There is a need for a uniform interpretation of the agreements in order to avoid possibly inconsistent interpretations under varying principles of the various state laws of the service area. *City of Springfield v. WPPSS, supra* at n. 2 and accompanying text; *Cf. DeFazio v. WPPSS, supra,* with *Chemical Bank v. WPPSS, et al.,* No. 82–2–06840–3 (King Co., Wash. Super.Ct., 1983). I rely chiefly on the doctrine enunciated in *Clearfield Trust v. United States, supra* at 318 U.S. at 367, 63 S.Ct. at 575, in holding that the interpretation of the contracts should not be subject to varying interpretations under state law.[1]

Certain parties appear to rely on *United States v. California,* 655 F.2d 914 (9th Cir. 1980), in arguing that there is no need for the application of federal common law. To the extent that *United States v. California* is applicable, I find that it supports the application of federal rules of decision. In *United States v. California,* the federal government sued California for damages caused to national forest land by a fire alleged to have been started through the negligence of state employees. The Ninth Circuit noted that this was essentially a local dispute, in which there was no need for a uniform federal rule, and no argument that application of a state rule of decision would frustrate a federal program. *Id.* at 920. The Ninth Circuit found no infirmity in the application of a state statute of limitation, enacted to govern a broad class of cases and not directed solely against the federal government, to bar the suit. *Id.* at 918–920.

I follow the law as enunciated in *United States v. California,* balancing federal interests against state interests with the balance weighed in favor of the application of state law, but find that the need for a uniform rule, and the need to avoid frustrating an important federal program, *see Id.* at 920, rebut the initial presumption that state law should apply, *see Id.* at 917. I also rely upon *North Dakota v. United States,* —— U.S. ——, 103 S.Ct. 1095, 75 L.Ed.2d 77 (1983), interpreting *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973) and *Clearfield Trust Co. v. United States, supra.* I hold that federal law governs the interpretation of federal contracts where otherwise inconsistent interpretations could be placed upon the contracts by the courts of various states

---

1. In *City of Springfield v. WPPSS, supra,* at n. 2 I noted that the impact of this litigation on the federal treasury could "potentially" be immense. I note that I am not in fact required to decide how BPA could finance its obligation to assume the "dry-hole" risk. In this case I need only decide that BPA bears this liability, and not the method of meeting it. The federal treasury is "potentially" liable, and I take this factor into consideration along with the many other federal interests in the operation of BPA's system, and find that federal law governs. A

crucial consideration requiring the application of federal law is the need for uniformity. Even if Oregon appellate courts approve the net billing agreement concept, *see* note 2, *infra,* there would still be uncertainty because of potential legal challenges in other states. *See Clearfield Trust, supra.* Such uncertainty illustrates the need for a uniform federal rule. *See United States v. California, supra,* at 920. A ruling based upon a source of law which can adjudge the rights of all parties to the net billing agreements is required.

composing the BPA service area. Here, the exposure of federal funds—whether held by BPA or the federal treasury—could be affected by that interpretation, and the federal program requires that conflicting state laws not create uncertainties which would impede it in raising funds in the financial markets. *See also United States v. Med O Farm, Inc.,* 701 F.2d 88, 90 (9th Cir.1983). This case is governed by federal law.

ALL SIGNATORIES OF THE NET BILLING AGREEMENTS HAD AUTHORITY TO ENTER INTO THOSE AGREEMENTS FOR THE CONSTRUCTION OF WPPSS PLANTS 1, 2 AND 3

■ The net billing agreements are contracts between the United States, acting through BPA, WPPSS and the Northwest utilities. Under these contracts, utilities buy power from BPA. Instead of paying BPA, however, utilities pay WPPSS, which uses the money to retire bonds issued for the completion of WPPSS plants 1, 2 and 3. Thus BPA "net-bills" for power and those bills are paid to WPPSS as third party beneficiary of the BPA-utility contracts and in satisfaction of WPPSS' rights under the net billing agreements. The risk of a "dry-hole" lies with BPA: if WPPSS plants 1, 2 and 3 are terminated prior to completion (or for that matter after completion) they will not produce power which BPA can sell to utilities. However, BPA will continue to market power to utilities and utilities will continue to buy it. Utilities will pay only for the power they use. BPA will either have to "eat" the loss in the sense that the

federal government will, in one guise or another, support BPA to the extent of the deficiency, or BPA will have to raise its power rates in order to reimburse itself for excess capacity. In the latter case, the result would be an overall rise in BPA's power rates at some date in the future.

The utilities entering into these agreements thus merely entered into authorized contracts for power. If no power is provided, no power is paid for. There is no infirmity in this arrangement. It is no different from the behavior which two private citizens might enter into for the buying and selling of any commodity. If no commodity is provided there is no duty to pay; the provider of the commodity must necessarily charge a price consonant with the cost of doing business. There is no unfunded "debt" created, requiring public entities to commit the use of their future taxing or general revenue powers. There is no principle which prevents public entities from contracting for the purchase of power and that is all that occurs under the net billing agreements. Such purchases are encouraged by applicable laws of the United States.[2] Based upon my examination of the net billing agreements, I hold that the United States bears the financial risk if the plants do not produce power. *See* note 1, *supra.*

I also find that all signatories to the net billing agreements had authority to enter into these federal contracts.[3] A declaration to this effect shall issue.[4]

2. *See* United States Constitution, Article I, Section 10, *see also Central Lincoln People's Utility District v. Johnson, supra.* It is not contended by any party that it lacks charter or statutory authority to enter into contracts for power. *Cf. Martin v. Oregon Building Authority,* 276 Or. 135, 142–143 and 155, 554 P.2d 126 (1976) (Leaseback arrangement in which state was obligated unconditionally on debts *held* unconstitutional because would constitute a long-term debt requiring use of taxing power). Nor does *Pacific Gas and Electric Co. v. State Energy Resources Conservation and Development Commission,* —— U.S. ——, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), have any application to this proceeding. The issue in *PGE* was whether Congress' passage of the Atomic Energy Act precluded state regulation of nuclear wastes.

*Id.,* —— U.S. at —— – ——, 103 S.Ct. at 1722–1729; *see also Id.* at n. 28. This determination obviously turned upon legislative intent and the special interests of California in economic regulation of energy. *Id.,* —— U.S. at —— – ——, 103 S.Ct. at 1726–1728. Such considerations do not apply to this case, which concerns contracts with the federal government. *See Clearfield Trust, supra.*

3. I emphasize the narrowness of my holding. I rule only that all signatories had authority to enter into the agreements, and make no ruling with respect to possible claims of estoppel or misrepresentation in connection with the agreements.

4. The Trojan nuclear plant was also financed through the use of net billing agreements. All

signatories to the net billing agreements concerning Trojan had authority to enter into those agreements, which are also governed by federal law and which are in all legal respects identical to the agreements underlying WPPSS plants 1, 2 and 3. The Trojan plant is now operable, and the likelihood of a "dry-hole" risk is certainly less likely regarding Trojan than it is with plants 1, 2 and 3. However, federal interests in the Trojan project and the need for uniformity of interpretation of the net billing agreements require that the declaration of authority include the net billing agreements underlying Trojan.