752 F.2d 1423
 The CITY OF SPRINGFIELD, etc., Plaintiff-Appellee,
v.
WASHINGTON PUBLIC POWER SUPPLY SYSTEM, etc.; City of
Eugene; Bonneville Power Administration, etc.;
Peter Johnson, etc.; et al., Defendants-Appellees,
v.
Peter DeFAZIO, et al., Intervening Defendants-Appellants.
 Nos. 83-3927, 83-4024.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1984.
Decided Feb. 4, 1985.
As Amended April 18, 1985.
 
 James C. Clarke, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, Or., for Washington Public Power Supply Systems.
 James T. Waldron, Mildred J. Carmack, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for Eugene Water & Electric Bd.
 Paul A. Gaulker, Atty., Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Charles H. Turner, U.S. Atty., Portland, Or., Dennis G. Linder, Branch Director, Dept. of Justice, Washington, D.C., David E. Lofgren, Thomas D. Miller, Sp. Attys., Portland, Or., for Bonneville Power Admin.
 John Neupert, Douglas Ragen, William H. Walters, Miller, Nash, Weiner, Hager & Carlsen, Portland, Or., for Washington Utilities Group.
 William F. Martson, Jr., Barbee B. Lyon, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for Portland General Electric Co.
 John Volkman, Stephen S. Walters, Joyce A. Harpole, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for Pacific Power & Light Co.
 Frank Hilton, Jr., Schwab, Hilton & Howard, Portland, Or., for Columbia Rural Electric Asso., Inc.
 John Lowery, Gordon Wilcox, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for the 17 defendants.
 Robert L. Ackerman, Ackerman, DeWenter & Huntsberger, Springfield, Or., for DeFazio.
 Rene Remund, Armstrong, Vanderstoep, Remund & Kelly, Chahalis, Wash., for Lewis County PUD 1.
 Benjamin H. Settle, Heuston & Settle, Shelton, Wash., for Mason County PUD 3.
 Appeal from the United States District Court for the District of Oregon.
 Before KENNEDY and FERGUSON, Circuit Judges, and WILLIAMS,* District Judge.
 FERGUSON, Circuit Judge:
 
 
 1
 This case involves a challenge to the validity of several contracts to construct and distribute power from nuclear power plants among (1) a number of Oregon, Washington and Idaho cities and public utility districts (the participants), (2) the Washington Public Power Supply System (Supply System or WPPSS), and (3) the Bonneville Power Administration (BPA). The district court rejected the argument that the participants lacked authority under local state law to enter into such agreements and upheld them under federal common law. We affirm, but with certain modifications.
 
 FACTS
 
 2
 Congress established the BPA to serve as the federal marketing agency for electric power produced in the Pacific Northwest. 16 U.S.C. Sec. 832 et seq. The BPA acquires hydroelectric and other power and distributes it to utility companies and other customers. WPPSS is a municipal corporation and joint operating agency under Washington law. Wash.Rev.Code Sec. 43.52. It is an association of nineteen Washington public utility districts and four Washington cities, formed to finance, construct, own, and operate electrical generating facilities.
 
 
 3
 In the early 1970s, the BPA entered into a series of three-party contracts with various public utilities and WPPSS to build and distribute electricity from four nuclear power plants. These plants were designated the Trojan Nuclear Project and WPPSS Nuclear Projects No. 1, No. 2 and No. 3. The agreement relating to each project is an identical three-party contract consisting of a "Project Agreement" and a "Net Billing Agreement." The "Project Agreement" provides "for financing, construction, ownership and operation" of the plant, and is executed by WPPSS and the BPA. The "Net Billing Agreement" provides for the distribution of electricity to the participants through BPA. A declared purpose of the net billing agreement is to "pool electric power and energy acquired hereunder with other power available to the [BPA] Administrator from the Federal Columbia River Power System so that any costs or losses associated with acquiring such power and energy will be borne by the [BPA] Administrator's ratepayers through rate adjustments if necessary." By such pooling, the effect of an unexpectedly great cost can be diluted by the use of cheaper and readily available energy from other sources.
 
 
 4
 The participants under the net billing agreements agreed to use a share or percentage of the electricity generated by the plant. The cost of that share is computed by multiplying the participant's share by the amount of the annual budget (less funds payable from other sources). This cost is reflected in the "Billing Statement" prepared by WPPSS and must be paid by the participant "whether or not the Project is completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of the Project output."
 
 
 5
 The participants do not receive their share of the power produced by the plant directly, however. They "assign" the power to the BPA, which pools it with its other sources of power. The BPA then provides the participants with the amount of electrical power they need, and deducts the amount the participants paid directly to WPPSS from the cost of the power delivered by BPA. Should the amount the participant paid to WPPSS exceed the cost of electricity actually delivered by BPA, the accumulated balance in favor of the participant "shall be paid in cash" to the participant by BPA, "subject to the availability of appropriations for such purposes."[1] The BPA Administrator is also authorized to "use his best efforts" to assign a participant's excess share to another BPA customer.
 
 
 6
 In 1976, WPPSS entered into two-party contracts with certain Northwest cities and utilities to construct and sell power from two additional nuclear power plants--Projects 4 and 5. Those two-party contracts do not involve the BPA. They [the Project's 4 and 5 two-party contracts] require the cities and utilities to pay their percentage of the costs specified in the contracts, and to receive their percentage of the power directly from WPPSS, even if the amount of power received is zero. Construction of Projects 4 and 5 was abandoned in 1982, and the local entities became obligated under the contracts to pay their percentage of the costs even though they were receiving no power and no power could be produced. The supreme courts of Washington and Idaho subsequently held that these two-party contracts could not be enforced against the local utilities and cities as the contracts were not properly executed or exceeded the authority of the cities or utilities. Asson v. City of Burley, 105 Idaho 432, 670 P.2d 839 (1983); Chemical Bank v. WPPSS, 99 Wash.2d 772, 666 P.2d 329 (1983). The Oregon Supreme Court issued an opinion on March 20, 1984 holding that Oregon local utilities acted within their authority in executing the two-party agreements with WPPSS. DeFazio v. WPPSS, 296 Or. 550, 679 P.2d 1316 (1984).
 
 
 7
 This case was brought by the City of Springfield, Oregon, and sought a declaratory judgment that it either had "full legal authority to enter into the [three-party] Net Billing Agreements on Projects 1, 2, 3 and Trojan by reason of Bonneville's obligations thereunder," or that, if it did not have authority to enter into the agreements, "Bonneville is liable to Supply System to make such payment and estopped to claim its lack of obligation to do so." The complaint was brought after the decision of an Oregon trial court which, in agreement with the courts of Washington and Idaho, held the two-party contracts for Projects 4 and 5 unenforceable. The Oregon Supreme Court has since reversed that court. DeFazio v. WPPSS, supra.
 
 
 8
 The City of Springfield joined as defendants all local participants in the net billing agreements, WPPSS and BPA. Springfield ratepayers, represented by Peter DeFazio, intervened, arguing that the case did not present "a genuine justiciable controversy" until the appeal of the Oregon trial court decision was decided and, in the alternative, that the city lacked authority to enter into the net billing agreements.
 
 
 9
 On a motion for summary judgment decided before the Oregon trial court was reversed, the district court upheld the validity of the net billing agreements and the authority of the local participants to execute them. City of Springfield v. WPPSS, 564 F.Supp. 90 (D.Or.1983). The court stated that "because BPA, a federal agency, has assumed the 'dry-hole' liability as to WPPSS plants 1, 2 and 3, the net billing agreements are contracts with the federal government whose interpretation is a matter of federal, not state concern." Id. at 93-94. The court then concluded: "The utilities entering into these agreements thus merely entered into authorized contracts for power. If no power is provided, no power is paid for. There is no infirmity in this arrangement." Id. at 95.
 
 ISSUES
 
 10
 1. Is there a justiciable controversy involving all parties?
 
 
 11
 2. Was the case decided on an adequate record or did the court err in denying discovery?
 
 
 12
 3. Did the district court correctly conclude that "federal common law" controlled?
 
 
 13
 4. Under the applicable law, did the signatories to the net billing agreements act within their legal authority?
 
 DISCUSSION
 
 14
 1. Was There a Justiciable Controversy Involving All Parties?
 
 
 15
 In its complaint, the City of Springfield joined all signatories to the net billing agreements because those parties might be affected by a declaration that the City of Springfield lacked authority to enter the agreement. The agreements provided that each participant's share would automatically be increased pro rata up to a specified maximum in the event any other participant failed to perform. The BPA cross-claimed against all signatories, alleging that all parties had the requisite authority to execute and perform those agreements. Several appellant public utility districts admitted that they had such authority and moved to be dismissed. They argue that there is no justiciable controversy and the district court's declaratory judgment was an advisory opinion as to them.
 
 
 16
 First, we find that there is an actual controversy as to the City of Springfield's authority to enter the agreement by virtue of the position asserted by the intervenors challenging that authority. While it appears to us that there was a case or controversy at the outset, the alternate position of the intervenor that the cities lacked authority to enter into the net billing agreements resolves any doubt on that point. See INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); Associated General Contractors of America v. Laborers International Union, 476 F.2d 1388, 1402-03 (Temp.Emer.Ct.App.1973). In addition, the parties have taken different positions on the issue of the validity of the agreements, on whether the agreements are governed by federal or by state law, and on whether abstention is appropriate.
 
 
 17
 Moreover, all parties would be affected by the invalidity of the agreement of any other party; a massive reshuffling of rights and obligations would result from invalidation of any of the agreements. This factor makes the joinder of all signatories desirable even if not indispensable, and the court could properly issue a judgment binding on all. See, e.g., Fed.R.Civ.P. 20.
 
 
 18
 2. Was the Case Decided on an Adequate Record? Did the Court Err in Denying Discovery?
 
 
 19
 DeFazio raises two related arguments: first, that the case was not properly decided because of the lack of a fully developed adversarial record; and, second, that the trial court erred by denying discovery.
 
 
 20
 DeFazio did not identify any questions of fact that would have prevented summary judgment. He questioned the participants' authority under state law. The district court correctly ruled that the dry-hole risk rested with the BPA. As a result, there are no factual issues which need to be resolved. A request for discovery may be denied when it is not relevant to the issues presented on a motion for summary judgment. St. Louis Union Trust Co. v. United States, 617 F.2d 1293, 1299-1300 (8th Cir.1980).
 
 
 21
 3. Did the District Court Correctly Conclude that "Federal Common Law" Controlled?
 
 
 22
 As some of the parties have pointed out, there are two separate issues in this case. The first issue is one of contract construction: Do the net billing agreements place the dry-hole risk on the BPA or on the participants? The interpretation of a contract is ordinarily made by reference to the terms of the contract itself. See Ayres v. Prudential Insurance Co., 602 F.2d 1309, 1312 (9th Cir.1979). "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." Restatement (Second) of Contracts Sec. 201(1) (1981). "[T]he primary search is for a common meaning of the parties, not a meaning imposed on them by the law." Id. comment c.
 
 
 23
 In this case the district court, in accordance with the intent of the parties to the net billing agreements, held that the contract placed the dry-hole risk on the BPA. It found that the participants will receive a credit from the BPA equal to its payment to WPPSS or receive a cash refund. A review of the agreements without reference to either state or federal law confirms the reasonableness of this interpretation. As the agreements are the same for all signatories, irrespective of their state of origin, the same interpretation should apply. There is no reason to fear that inconsistent interpretations of the agreement will result from various state laws as the agreement itself is clear and requires no implied-in-law guidelines to interpretation.
 
 
 24
 The second issue presented is whether the various local participants acted within their legal authority in executing the net billing agreements. The district court apparently applied "federal common law" to this issue. As in United States v. Little Lake Misere Land Co., 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), there is no specific federal legislation mandating that state or particular federal law control the BPA net billing agreements. See id. at 593, 93 S.Ct. at 2397. Thus federal courts must "fashion the governing rule of law according to their own standards." Id. at 594, 93 S.Ct. at 2397-2398 (quoting Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67, 63 S.Ct. 573, 574-75, 87 L.Ed. 838 (1943)). Relevant state law must be identified in order to determine whether it should be borrowed or if it would be "aberrant or hostile" to the federal program involved. Little Lake Misere, 412 U.S. at 596, 93 S.Ct. at 2398; United States v. Med O Farm, Inc., 701 F.2d 88, 90 (9th Cir.1983); United States v. California, 655 F.2d 914, 917 (9th Cir.1980). Choice of law "depends ultimately and exclusively on the nature of the issue involved and the significance of the specific federal interests in the resolution of [the dispute]." 19 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, Sec. 4514, at 274 (1982).
 
 
 25
 In this case the City of Springfield sought a declaration that it either did or did not act within its legal authority in entering into the three-party net billing agreements. The Oregon trial court (reversed on appeal), the Washington Supreme Court in Chemical Bank v. WPPSS, 99 Wash.2d 772, 666 P.2d 329 (1983), and the Idaho Supreme Court in Asson v. City of Burley, 105 Idaho 432, 670 P.2d 839 (1983), had held that their local utilities and cities were not authorized to enter into the two-party contracts for WPPSS Projects 4 and 5 (which did not include the net billing arrangement with BPA) due to state constitutional or statutory debt limitations. In order to determine whether the City of Springfield acted within its authority, or had the "capacity" to enter the contract, the limits of the city's authority must be ascertained. The state's interest in ascertaining and applying state law in this area is great as a local government's authority goes directly to "the State's freedom to structure integral operations in areas of traditional governmental functions." National League of Cities v. Usery, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976). See Bambu Sales, Inc. v. Gibson, 474 F.Supp. 1297, 1301 (D.N.J.1979).
 
 
 26
 The federal interest, which must be balanced against the state interest, United States v. California, 655 F.2d at 917, is two-fold. First, the federal government has an interest in enforcing its contracts. However, the Supreme Court in United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 16 L.Ed.2d 404 (1966), rejected the government's argument that there is an "overriding federal interest" in the "unlimited right of the Federal Government to choose the persons with whom it will contract." Id. at 349 & n. 19, 86 S.Ct. at 505 & n. 19. The enforcement of the contracts alone is not a strong enough federal interest to overcome the essential state interest in defining the scope of local governmental authority. The other federal interest recognized by the district court is one of uniformity. 564 F.Supp. at 94. However, in Yazell, the Court found no problem in applying the different laws of the states to local matters, such as the capacity to contract, particularly when the contract at issue is adapted "specifically and in great detail" to the state law. 382 U.S. at 357, 86 S.Ct. at 509.
 
 
 27
 In this case the net billing agreements were developed for use in the Pacific Northwest. Given the regional nature of the BPA and its intimate involvement in the local distribution of electricity, it would seem that whatever contracts it makes with local governments should be made with reference to the relevant local laws. Once the terms and obligations of the agreements themselves are uniformly interpreted, the authority of the various local governmental units to enter into them is a matter of local law.4. Under Applicable Law, Did the Participants Act Within Their Legal Authority?
 
 
 28
 The net billing agreements are sufficiently different from the two-party contracts for WPPSS Projects 4 and 5 to require a separate analysis. DeFazio v. WPPSS, 679 P.2d at 1321-22; Asson v. City of Burley, 670 P.2d at 841-42; Chemical Bank v. WPPSS, 666 P.2d at 332-33. Before undertaking that analysis, it is worthwhile to note several key differences in the three-party net billing agreements. They are: (1) although the participants are obligated to pay WPPSS regardless of whether they receive power from the plants, they receive either credit for those payments for power actually supplied by BPA or a refund from BPA; (2) there are provisions for shifting the debt to other BPA users in the event a participant no longer needs the power from WPPSS; (3) electric rates are not directly tied to a particular plant's expenses as BPA pools electrical power from various sources to determine rates; and (4) the dry-hole risk is not borne exclusively or primarily by the local participants. (It may be borne by them indirectly if BPA raises its rates to cover its liability. On the other hand, BPA may receive appropriations to cover some costs associated with the expense of nuclear power.)
 
 
 29
 Because the net billing agreements place the dry-hole risk on the BPA, and not on the local participants, and because the local participants will receive either electricity or a cash refund equal to their payments to WPPSS, the district court was correct in finding that this arrangement is in fact a contract for the purchase of electricity. None of the participants have argued that they lack authority to enter into such contracts, indeed, the raison d'etre of the utilities, at least, is to provide electricity. The parties have conceded that they are authorized under local law to enter into contracts to purchase electricity.
 
 CONCLUSION
 
 30
 The local participants did not exceed their authority by entering into the net billing agreements with BPA and WPPSS. Although the district court erred in declaring the participants' authority to be defined by an amorphous federal common law, it reached the right result.
 
 
 31
 One other aspect of the district court's opinion needs clarification. The district court stated that "the United States bears the financial risk if the plants do not purchase power." 564 F.Supp. at 95. However, it also noted that the United States' liability was "potential," and that it is the BPA which, as a party to the contract, bears the financial risk. 564 F.Supp. at 94 n. 1. The issue of whether it is the BPA or the United States which bears the contractual liability under the agreement is not now before us and we therefore do not address that issue. With that clarification the district court is AFFIRMED.
 
 
 
 *
 Honorable David W. Williams, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 In its brief, the Bonneville Power Administration has noted that appropriations for this purpose may be provided pursuant to 16 U.S.C. Sec. 838i(a), (b)(6)(ii)