CITY OF LOUISVILLE, Kentucky, et al., Movants,

v.

FISCAL COURT OF JEFFERSON COUNTY, Kentucky, et al., Respondents.

80–SC–857–DG.

Supreme Court of Kentucky.

Nov. 3, 1981.

J. Bruce Miller, Jefferson County Atty., Stuart L. Adams, Jr., Asst. County Atty., Louisville, for Fiscal Court of Jefferson County.

Henry A. Triplett, Louisville, for Fadel, Dean, Cunningham, Jr. & Oliver.

Joseph B. Helm, Stephen R. Schmidt, Brown, Todd & Heyburn, Louisville, for Highbaugh Enterprises, Inc.

Max Simmons, Director of Law, Donald L. Cox, Louisville, for City of Louisville.

Robert L. Sloss, Sheryl G. Snyder, Marianna Gordon, Wyatt, Tarrant & Combs, Louisville, for Thomas W. Bullitt, et al.

Henry Watson III, Lexington, for amicus curiae (Kentucky Municipal League and Municipal Atty.'s Ass'n of Kentucky).

STEPHENS, Justice.

The issue we deal with on this appeal is the validity of a contract between the City of Louisville and certain property owners which attempts to settle a remonstrance suit.

In November of 1977, the City introduced an ordinance which proposed to annex a large area east of the city. The area included a regional shopping center, a large working farm, a residential subdivision, a smaller shopping center and office complex, several motels and an interstate highway service area. Two remonstrance suits were filed.[1] The suits were consolidated for trial, and the Jefferson County Fiscal Court was made a party.[2] Prior to trial, Oxmoor and the City negotiated a settlement which resulted in the contract in question. Essentially, Oxmoor agreed to be annexed and the City agreed to place the property in a special taxing and service district, with a reduced ad valorem real estate tax rate, for a number of years.[3]

Following the execution of the contract, the Board of Aldermen of the City enacted an ordinance ratifying it. The City and Oxmoor tendered an agreed judgment,

---

1. For convenience, we will refer to the two remonstrants as Oxmoor and Hurstbourne.

2. See KRS 81.290(2), repealed in 1980.

3. The contract will be discussed in detail, *infra*.

which incorporated the contract, to the trial court. Hurstbourne and the Fiscal Court of Jefferson County objected to the entry of the judgment, claiming that the contract, which was the underpinning of the judgment, was void. The trial court agreed and ruled the contract invalid for two reasons: (1) the city council had no authority to contract for a specified tax rate beyond its term of office, and (2) the City's agreement with Oxmoor to cooperate with respect to future zone changes and its agreement not to take any action which would adversely affect the present agricultural land, were too vague. As a result of the trial court's ruling, the remonstrance action is awaiting trial, pending the outcome of this appeal.

On appeal, the Court of Appeals, with two concurring opinions, affirmed the trial court and declared the contract invalid. The majority opinion held that Section 172A of the Kentucky Constitution, which authorizes variable tax rates, applies only to farm land and is therefore not available to sustain the contract. The concurring opinion disagreed with the majority's restrictive interpretation of Section 172A but limited its application of variable tax rates to those areas in which the taxing district is unable to furnish "important" governmental services which it does furnish to other areas. Because of the obvious importance of the issues in this case, we granted discretionary review.

The main issues which we will discuss are: (1) Do the respondents, Hurstbourne and Jefferson County Fiscal Court, have standing to challenge the validity of the contract? (2) Does Section 172A of the Kentucky Constitution apply only to farm land? (3) May a city, by ordinance, limit the ad valorem tax rate beyond its term of office? (4) May a city annex property with a provision for de-annexation, solely at the discretion of the property owners affected?

Since the focal point of the litigation is the agreement between the City and Oxmoor, it will be helpful to discuss its terms and conditions. The parties to the contract are the City of Louisville and all of the property owners in the area to be annexed.

The main provisions of the contract may be summarized as follows:

(1) Oxmoor consented to annexation.

(2) The City agreed to place Oxmoor in a "special taxing and servicing district" wherein the City will furnish substantial "non revenue-producing services," including 24-hour per day fire and police protection, emergency ambulance service and road maintenance.

(3) The City and Oxmoor agree that the Oxmoor area shall not receive designated non revenue-producing services such as sidewalk construction and maintenance, street lights, sanitary and storm sewers, fire hydrants, snow removal and garbage collection.

(4) The real estate ad valorem tax rate on the Oxmoor area shall not exceed ten cents per $100 assessed valuation for the first post-annexation five-year period, twelve cents per $100 for the second five years, fifteen cents per $100 for the third five-year period, and eighteen cents per $100 valuation for a fourth five-year period (as opposed to the tax rate paid presently by Louisville property owners of approximately fifty-six cents per $100 assessed value).

(5) The City further agrees to "assist and cooperate fully" with the Oxmoor parties, "in all of the Owners' applications for zoning changes, building and other permits, changes in street entrances to and exits from the area, street layouts, stream usage and flood control . . . ."

(6) The City agrees not to take any action of any nature that would adversely affect "the agricultural or forestry use" in the area or "the lawful rights and privileges presently enjoyed" by the Oxmoor shopping center parties.

(7) The term of the agreement is for a period of five years, and shall be automatically renewed for three successive terms of five years each; provided, however, that there will be no such renewal if two of the named

Oxmoor parties notify the City that they will not consent to the renewal. If such consent is withheld, de-annexation occurs.

## I. DO THE JEFFERSON COUNTY FISCAL COURT AND HIGHBAUGH ENTERPRISES (ONE OF THE PROPERTY OWNERS IN HURSTBOURNE) HAVE STANDING TO QUESTION THE LEGALITY OF THE CONTRACT?

The remonstrance actions of Hurstbourne and Oxmoor were filed in March of 1979. In each case the Jefferson County Fiscal Court was joined as a party defendant. Oxmoor and the City of Louisville tendered an agreed judgment based on the contract in question here. The Fiscal Court and Highbaugh Enterprises challenged the entry of the judgment because of the alleged illegality of the contract.

It is argued that neither the Fiscal Court nor Highbaugh has standing in these remonstrance actions. We do not agree.

■ The Fiscal Court was joined as a party because of the mandate of KRS 81.-290(2) which provided, "Whenever the proposed annexation . . . shall be protested . . . the Fiscal Court of such county *shall be made a party to such a protest suit.*" (emphasis added). It is true that this statute was repealed, effective July 15, 1980. However, the appearance of the Fiscal Court as a party was mandated as of the time the actions were filed in 1979 and the concomitant rights of the Fiscal Court to appear and raise any and all questions concerning the annexation were vested then. The subsequent repeal of the statute did not change these rights. We believe the statute is dispositive of the question of standing of the Fiscal Court.

■ Highbaugh Enterprises is not only a remonstrant in the Hurstbourne suit, but also a taxpayer in the present City of Louisville. We believe Highbaugh has an absolute right, as a taxpayer of the City, to question the legality of a contract which would allegedly require city officials to administer the tax laws in an unconstitutional manner. *Kelley v. City of Ashland*, Ky., 562 S.W.2d 312 (1978); *Russman v. Luckett*, Ky., 391 S.W.2d 694 (1965).

## II. DOES SECTION 172A OF THE KENTUCKY CONSTITUTION APPLY SOLELY TO FARM LAND?

■ The majority of the Court of Appeals ruled the agreement between the City of Louisville and Oxmoor invalid because it applied differing tax rates to the urban area of the City and to the urban area in Oxmoor. They reasoned that Section 172A of the Kentucky Constitution, on which the agreement was based, applies only to farm land. We do not agree, and conclude that § 172A applies to urban land as well as agricultural land.

§ 172A is as follows:

§ 172A. ASSESSMENT OF FARM LAND ACCORDING TO VALUE FOR FARM PURPOSES.

Notwithstanding contrary provisions of Sections 171, 172, or 174 of this Constitution—

The General Assembly shall provide by general law for the assessment for ad valorem tax purposes of agricultural and horticultural land according to the land's value for agricultural or horticultural use. The General Assembly may provide that any change in land use from agricultural or horticultural to another use shall require the levy of an additional tax not to exceed the additional amount that would have been owing had the land been assessed under Section 172 of this Constitution for the current year and the two next preceding years.

The General Assembly may provide for reasonable differences in the rate of ad valorem taxation within different areas of the same taxing districts on that class of property which includes the surface of the land. Those differences shall relate directly to differences between non-revenue-producing governmental services and benefits giving land urban character which are furnished in one or several areas in contrast to other areas of the

taxing district. (Proposed by Acts 1968, ch. 103, ratified November, 1969).

The clear purpose of § 172A is to permit a lack of uniformity in taxation, both as to rate and valuation, for the land affected. This is, of course, totally opposite to the historical and constitutional principles built into our system. The second paragraph specifically permits "reasonable" differences in the tax rate "within different areas of the same taxing districts". The amendment then provides a guideline and a limitation to the authorized differences. They shall "relate directly" to the differences in so-called "non-revenue-producing governmental services and benefits" furnished by the taxing authority in different areas of the taxing district. There are no words or phrases here which restrict this section of the amendment to farm land. Different rates are specifically contemplated when the land affected is given an "urban character" by the different governmental services which are furnished.

We have so held in the past. In *Holsclaw v. Stephens*, Ky., 507 S.W.2d 462 (1974), there was a challenge to the proposed charter of the urban county government in Lexington and Fayette County. One of the provisions attacked was that which authorized a differential in tax rate for a corresponding difference in non-revenue producing governmental services provided by the government. We specifically held that § 172A authorized such a difference:

"We hold that Section 172A of the Constitution expressly authorizes the General Assembly to provide for reasonable differences in the rate of ad valorem taxation within different areas of the same taxing district . . . ." *Id.*, at 476.

Because KRS 82.085 specifically allowed second class cities (and urban-county governments) to establish different tax rates for different services provided, we upheld the provision of the charter. There is nothing in that opinion that restricts the application of 172A to farm land. The questioned provision of the urban county charter applied to the entire geographical area of Fayette County which, of course,

consists not only of agricultural land but also of a great deal of urban development. It is clear that the differential in tax rates applied to all land in that county.

In *Jacobs v. Lexington-Fayette Urban County Government*, Ky., 560 S.W.2d 10 (1978), although we disallowed a difference in the tax rate as far as it applied to personal property and mineral rights, we reiterated our view that Section 172A and KRS 82.085 authorize the levy of "ad valorem taxes at different rates", *id.*, p. 14. We drew no distinction between farm land and urban land. We permitted such differing rates in all situations except in cases of personal property and mineral rights. We therefore conclude that the Court of Appeals was in error when it interpreted Section 172A (and all enabling legislation passed by the General Assembly) to apply only to farm land.

One further point remains. In the concurring opinion of the Court of Appeals it was opined that although Section 172A and KRS 82.085 permitted "variable" tax rates, there is an inherent danger in unrestricted differences in such rates. We concur in the reasoning of Judge Vance and adopt it as part of our opinion:

(Section 172A does not permit) "a taxing authority to cease providing or to agree not to provide governmental services in selective areas where it has customarily provided and is capable of providing them and by reason thereof create a different tax rate.

"Such a scheme would open the doorway to individuals or groups to barter with the taxing authority for a favorable tax rate for their particular property and it would not be unusual if the more prominent and influential citizens fared better than others.

"Although section 172A imposes the safeguard that any difference in tax rate must relate directly to the difference in service, it is conceded that the exact cost of a governmental service is difficult to compute and equally difficult to challenge.

"I especially do not believe that section 172A permits residents of an area sought to be annexed by a city to barter with the city for a more favorable tax rate than is accorded to other citizens in exchange for their agreement not to protest the annexation. This, no doubt, would lead residents of every area sought to be annexed to remonstrate in the hope that they might be able to negotiate for themselves a favorable tax rate and many cities, like the city of Louisville in this case, might prefer to accede to some tax concession rather than to proceed with litigation on the merits of the annexation."

■ Although many reasons were given in the briefs as to why Oxmoor and the City entered into the Agreement, the record is silent as to the availability of services provided to the annexed area by the City. There is no basis set out in the contract for the difference in services authorized or not authorized. Moreover, there is no factual basis set out in the contract for the tax rates agreed upon. We believe that under the policy set out in Section 172A the difference in tax rates must be "reasonable". The present contract falls short of that requirement in that no factual basis for the rates agreed on is set out. We believe that the danger pointed out by Judge Vance is exemplified by this agreement.

### III. MAY A CITY COUNCIL, BY ORDINANCE, LIMIT THE AD VALOREM TAX RATE BEYOND ITS TERM OF OFFICE?

As stated, one of the key provisions of the agreement between the City and Oxmoor bound the City to set specified ad valorem tax rates in the future. The trial court, in ruling the agreement invalid, declared that a municipality does not have the power to bind future city administrations in matters which are governmental in nature. The Court of Appeals failed to discuss this issue.

■ The law is clear that a legislative body may not limit its power to act one way or another in the future in governmental, as opposed to proprietary, functions.

Thus, "Where the contract involved relates to governmental or legislative functions of the council, or involves a matter of discretion to be exercised by the council, unless the statute conferring power to contract clearly authorizes the council to make a contract extending beyond its own terms, no power of the council so to do exists, the council presently holding such powers is vested with no discretion to circumscribe or limit or diminish their efficiency, but must transmit them unimpaired to their successors...." 56 Am. Jur.2d *Municipal Corporations*, § 154, at 206.

*See, Plant Food v. City of Charlotte*, 214 N.C. 518, 199 S.E. 712 (1938). Kentucky adopts this position. *White v. Glasgow*, 148 Ky. 13, 146 S.W. 19 (1912). *See also, Wabash Ry. Co. v. City of Defiance*, 167 U.S. 88, 17 S.Ct. 748, 42 L.Ed. 87 (1897).

It is beyond cavil that the power to tax and to set tax rates is a governmental function. It is the right and duty of the legislative body of the City of Louisville to set the tax rate. KRS 91.260.

We have no difficulty in declaring that the provision of the agreement which sets tax rates for twenty years is void as being against public policy.

### IV. MAY A CITY ANNEX PROPERTY WITH A PROVISION FOR DE-ANNEXATION SOLELY AT THE DISCRETION OF THE PROPERTY OWNERS AFFECTED?

The term of the agreement is for a period of five (5) years, and shall "... be automatically renewed for three successive renewal terms of five years unless both the Co-Trustees and the Bullitts (some of the property owners in Oxmoor) notify the City in writing prior to the expiration of the original or any renewal term, respectively, that they will not consent to the renewal or further renewal of this agreement." Paragraph 3, agreement between City and Oxmoor.

Although this matter was not argued at any level of the litigation we feel that it is of sufficient importance for us to take cognizance of it.

It is clear that, under this provision of the agreement, if the individuals named are not satisfied, for any reason or for no reason, with the deal they have negotiated for annexation, they may terminate the agreement, and de-annex the city property affected. This provision provides for a limited annexation subject to a condition subsequent.

The annexation process is a purely statutory one. KRS 81A.010 *et seq.* The annexing city must follow a specific step-by-step procedure, including holding a public hearing and preparing a highly technical and detailed report. KRS 81A.050, KRS 81A.060. Upon the enactment of the final ordinance, "... *the territory shall become part of the city*...." KRS 81A.010 (emphasis added). Nothing appears in the statute allowing an annexation on a condition subsequent permitting de-annexation at the whim of an annexed property owner. There is a specific manner in which a city of the first class may reduce its boundaries (de-annex), KRS 81A.010, KRS 81A.020. We believe that since the process of annexation and de-annexation are children of the legislature and involve critical property and economic rights of property owners, the procedures set out by the statutes must be followed precisely. When an annexation ordinance has been passed and has become effective the annexed territory can be de-annexed from the city only in accordance with the prescribed statutory procedure. *Kaelin v. City of Indian Hills*, Ky., 286 S.W.2d 898 (1956).

There is no legislative authority to permit the de-annexation procedure provided for in the contract, and the dangers inherent in such a procedure are not dissimilar to those previously described.

## V. MISCELLANEOUS

While we do not desire to lengthen this opinion unduly, we are forced to mention one other point in this agreement that troubles us. As previously stated, the City, in paragraph 5(c) and (d), is obligated to "cooperate fully and in good faith" with Oxmoor, or any of the owners therein, in an application for "reasonable zoning changes, building and other permits, changes in street entrances to and exits from the area, street layouts, storm usage and flood control and any and all other changes for which municipal, environmental or any other governmental approval is requested ...." Also, the City is required not to take "any action of any nature whatsoever which shall diminish or adversely affect the agricultural or forestry use of the part of the area presently so used ...."

The trial court ruled that these two provisions were void as being too vague. We believe that they are not only vague but also are illegal as being against public policy. By their terms, the city is required to cooperate with Oxmoor, (composed entirely of property owning private citizens) in matters which fall within the duty and responsibility of the city, viz; zoning and allied matters. It is very conceivable, (and even likely) that the obligations of the City under the agreement would create a conflict between the constitutional and statutory duties of the City and its contractual obligations.

Not only does the contract place an obligation on the city which may create conflicts of interest, but it also creates an obligation to legislate in the future. The areas of zone changes, changes in street entrances, flood control, etc., are all legislative in nature. A contract which binds a legislative body, present or future, to a course of legislative action is void against public policy, *Plant Food v. City of Charlotte, supra*. We conclude that said provisions are void as being against public policy and are indeed, a further illustration of those selfsame dangers that permeate this contract.

The decision of the Court of Appeals is affirmed.

All concur.