# Vermont Department of Public Service v. Massachusetts Municipal Wholesale Electric Co., et al.

[558 A.2d 215]

No. 86-555

Present: **Allen, C.J., Peck, J., and Barney, C.J. (Ret.), Keyser, J. (Ret.) and Martin, Supr. J., Specially Assigned**

Opinion Filed September 27, 1988

Motion for Reargument Denied January 30, 1989

*Jeffrey L. Amestoy, Attorney General, William E. Griffin, Chief Assistant Attorney General,* and *Michael Marks, Dinah Yessne* and *Samuel H. Press, Special Assistant Attorneys General,* Montpelier, for Plaintiff-Appellant Department of Public Service.

*Edward B. French, Jr., David B. Stackpole Law Offices,* Stowe, for Plaintiff-Appellant Village of Stowe.

*Michael L. Burak* and *Jon T. Anderson* of *Goldstein, Manello, Burak & Gabel,* Burlington, for Plaintiff-Appellant Vermont Electric Cooperative.

*Parker, Lamb & Ankuda, P.C.,* Springfield, and *Daniel O. Mahoney* and *Jeffrey F. Jones* of *Palmer & Dodge,* Boston, Massachusetts, for Defendant-Appellee Massachusetts Municipal Wholesale Electric Co.

*Stephen C. Walke, Jr.* and *Ralph W. Howe, III* of *Paterson, Walke & Pratt, P.C.,* Montpelier, for Defendants-Appellees Washington Electric Cooperative and Village of Ludlow, Lyndonville, Morrisville and Northfield.

*Rubin, Rona, Kidney & Myer,* Barre, for amicus curiae Vermont Public Interest Research Group, Inc.

*McKee, Giuliani & Cleveland,* Montpelier, for amicus curiae Vermont League of Cities and Towns.

**Allen, C.J.** In 1979, four Vermont municipalities and two electric cooperatives contracted with the Massachusetts Municipal Wholesale Electric Company (MMWEC) for shares of the power generating potential of its Project No. 6. This project consisted of a 6.001 percent ownership interest in two nuclear power plants to be built in Seabrook, New Hampshire. In 1985, the Vermont Department of Public Service (Department) filed a complaint in Washington Superior Court, alleging that the Vermont utilities had violated statutory and common law in executing the contracts

with MMWEC. The superior court granted summary judgment for defendants, and this appeal ensued. We reverse and hold that the contracts were void ab initio.

Although the underlying litigation was designated formally as a complex action under the provisions of V.R.C.P. 16.1, only a brief summary of the procedural history is necessary here. The Department filed its complaint, seeking declaratory and injunctive relief, on October 18, 1985. The Village of Stowe intervened shortly thereafter as a plaintiff, and the Vermont Electric Cooperative (VEC), originally a defendant, was denominated a plaintiff after accepting plaintiffs' position. The defendants include MMWEC and the Villages of Ludlow, Lyndonville, Morrisville, and Northfield, as well as the Washington Electric Cooperative (WEC).

MMWEC is a joint planning and action agency, incorporated under the terms of special enabling legislation in Massachusetts, through which municipal electric systems may finance and acquire supplies of electrical power or power sources. Its membership comprises thirty-four Massachusetts municipalities; it is governed by a board of nine directors, two appointed by the Governor and seven elected by the Massachusetts-member municipalities. There is no provision for representation of the Vermont municipalities or cooperatives on the MMWEC Board.

In 1976, MMWEC began development of a bulk power supply system consisting of ownership interests in various existing and planned electric power facilities. Included among the planned facilities were Seabrook nuclear plants No. 1 and No. 2. MMWEC obtained a fractional ownership interest in the two plants and designated this interest as Project No. 6. The contracts at issue here relate to this project.

The basic theory under which the parties operate is as follows: MMWEC finances its construction and other costs by issuing bonds; in return, the participants commit a sufficient portion of their utility revenues to cover MMWEC's monthly debt service on the bonds. To this end, MMWEC and public utilities from several states, including the Vermont participants, executed "power sales agreements" (PSAs) regarding Project No. 6.[1]

---

[1] Plaintiff Village of Stowe entered into a collateral agreement with defendant Village of Morrisville, agreeing to assume a portion of Morrisville's Project No. 6 obligation.

Under the agreements, which became effective upon the execution and delivery of PSAs covering 100 percent of the project, participants purchased shares of "project capability." "Project capability" is defined in the PSAs as "the amounts of electric capacity and energy, if any, which the Project is capable of producing at any particular time (including times when the Project is not operable or operating or the operation thereof is suspended, interrupted, interfered with, reduced or curtailed, in each case in whole or in part for any reason whatsoever), less Project station use and losses . . . ."

Each month, the participants are required to pay their proportional shares of MMWEC's costs relating to the project, including debt service; an additional ten percent of the debt service figure is paid monthly for deposit in a reserve and contingency fund. MMWEC is empowered to fix these monthly payments so as to provide revenues sufficient to meet its obligations. The participants are not required to make payments from any source other than revenues derived from their electric departments or systems, but they are obligated to fix their rates in amounts at least sufficient to meet their obligations under the PSAs. Participants also agree to pay any unrelated debts or amounts which might otherwise constitute a charge or a lien upon their revenues, and, except in certain circumstances, they forego the right to issue any of their own revenue bonds without first providing for the payment of all operating expenses and the monthly payments to MMWEC. Further, the agreements include a so-called "step-up" provision, under which each participant's monthly obligation will increase proportionately to cover MMWEC's costs should any participant default.

The participants must make the scheduled monthly payments to MMWEC without regard to whether the project is completed, operating, or even undertaken. Such provisions are known variously as "take-or-pay" or "hell or high water" because of the unconditional nature of the obligation imposed. Here, the monthly payments are required in their full amounts, even if no electricity is ever produced. Participants do not acquire any ownership interest in the physical plant.

The agreements provide further that MMWEC, acting in good faith and in accordance with the tenets of "Prudent Utility Practice" (a term defined in the agreements), will use its best efforts to arrange for the financing, planning, engineering, design, acqui-

sition, construction, operation and maintenance of the project; obtain all necessary permits and rights; and issue revenue bonds to finance all costs. While the Vermont participants share in the costs and risks of the project, they retain no decision-making power with respect to the incurrence of debt, plant construction, or operation.

In the superior court, the parties filed an extensive stipulation of facts, a procedural stipulation, and subsequent motions and cross-motions for summary judgment. After hearing, the court granted summary judgment in favor of defendants. The judgment was entered pursuant to V.R.C.P. 54(b) on the cross-claims for summary judgment.

Three principal questions are presented on appeal. First, plaintiffs contend that the lower court erred in concluding that the Vermont utilities had statutory authority to enter into contracts that include take-or-pay provisions. Second, we must determine whether the PSAs are void, in any event, because the participants attempted to transfer all decision-making authority with regard to the project to MMWEC, thereby violating the fundamental principle of nondelegation. Finally, plaintiffs maintain that the municipal utilities could not legally incur the financial obligations at issue without obtaining voter approval and that the cooperatives were required to obtain the approval of the Public Service Board.

## I.

In concluding that the Vermont participants were authorized to enter into the PSAs, the superior court relied upon 30 V.S.A. § 4002, which provides in part that:

> Any cooperative or municipal electric utility shall have:
>
> . . . .
>
> (2) authority to act in participation with other such utilities in arranging for the purchase of supplies of capacity and energy from other utilities, either within or without the state of Vermont, including purchases from private electric utilities, municipal electric utilities, cooperatives, associations of utilities, or public authorities; . . .

The plain language of this section authorizes Vermont utilities to act jointly in obtaining supplies of electrical capacity and energy. Here, however, the participants in the project are not involved in the ordinary purchase of capacity and energy. Instead, they have obtained shares of "project capability," defined in the agreements as "the amounts of electric capacity and energy, *if any,* which the Project is capable of producing at any particular time . . . ." (emphasis supplied). Section 4002 provides basic joint purchasing authority; it does not follow that municipal and cooperative utilities are free to enter into speculative contracts that impose unconditional, long-term obligations in the face of "if any" disclaimers. The statute authorizes joint purchases of *supplies* of capacity and energy. It is contemplated that these supplies will be ascertainable in amount and that contractual remedies will be available in the event of any deficiencies.

A comparison with the provisions of two other statutes illustrates the limited scope of the plain language in question. 30 V.S.A. § 604(a)(2) provides that, *in addition* to the general powers granted to municipal utilities, Burlington and Lyndonville may enter into utility contracts, "including, without limitation, contracts for the payment of obligations imposed without regard to the operational status of a facility or facilities . . . ." In a clearer grant of take-or-pay contracting authority, chapter 84 of Title 30 establishes the Vermont Public Power Supply Authority (VPPSA). Section 5013(a) of that chapter, entitled "Special powers," empowers the VPPSA and utilities to contract on a basis that "may provide for the payment of unconditional obligations imposed without regard to whether a project is undertaken, completed, operable or operating . . . ." In contrast to these express grants of special powers, § 4002 merely authorizes ordinary, joint purchases of supplies of capacity and energy.

Our analysis is buttressed by decisions in other jurisdictions relating to virtually identical contracts. These cases all involve PSAs executed by the Washington Public Power Supply System (WPPSS) and public utilities of several northwestern states. In *Chemical Bank* v. *Washington Public Power Supply System,* 99 Wash. 2d 772, 666 P.2d 329 (1983) (*Chemical Bank I*), the Supreme Court of Washington held that statutory authority to purchase "electric current for sale and distribution" did not empower the Washington participants in the PSAs to purchase project capability. *Id.* at 782, 666 P.2d at 334-35. That court stated:

> [T]he purchase of "project capability" under this agreement is essentially an unconditional guarantee of payments on [WPPSS's] revenue bonds, secured by a pledge of the participants' utility revenues, in exchange for a share of any power generated by these projects. The agreement expressly provides for the possibility that no electricity will be generated and that participant payments will be due even if the project is not completed. The unconditional obligation to pay for no electricity is hardly the purchase of electricity. We hold that an agreement to purchase project capability does not qualify as a purchase of electricity.

*Id.* at 783-84, 666 P.2d at 335.

The Washington court later granted a motion to reconsider its decision in *Chemical Bank I* because of the importance of the issues involved and because of the complexity of the statutory authority issue. After considering several newly raised facts and arguments, the court affirmed its earlier holding. *Chemical Bank* v. *Washington Public Power Supply System,* 102 Wash. 2d 874, 896, 691 P.2d 524, 537 (1984) (*Chemical Bank II*).

In *Asson* v. *City of Burley,* 105 Idaho 432, 670 P.2d 839 (1983), the Supreme Court of Idaho reached a similar conclusion. Under Idaho statutes, municipalities are authorized to " 'acquire, own, maintain and operate electric power plants, purchase electric power, and provide for distribution to the residents of the city.' " *Id.* at 443, 670 P.2d at 850. The Idaho court reviewed these and other enactments and stated that:

> [W]e can find no statutory authorization for the purchase of "project capability" where such purchase comprehends the payment of long-term indebtedness for which no power may be supplied, and for which no ownership interest is acquired. The municipality is neither acquiring, owning, maintaining, or operating a plant, nor purchasing electrical power. It is underwriting another entity's indebtedness in return for merely the possibility of electricity.

*Id.*

On the other hand, after reviewing identical PSAs, the Supreme Court of Oregon ruled that Oregon participants had not exceeded their authority in signing the agreements. *DeFazio* v.

*Washington Public Power Supply System,* 296 Or. 550, 594, 679 P.2d 1316, 1345 (1984). The *DeFazio* court observed that "[i]t is not obvious why the legal character of the transaction should differ if the power plants were completed at great cost but produced only a small fraction of the expected electricity rather than none." *Id.* at 578, 679 P.2d at 1335. This observation obfuscates the true distinction between take-or-pay agreements and other power supply contracts, however. Ordinarily, electrical power contracts are agreements to purchase verifiable supplies of energy, and contractual remedies are available for any shortfalls. It is for the legislature, not the courts, to define limits upon municipal purchasing and financing authority. In any event, *DeFazio* is wholly distinguishable because it was explicitly based on Oregon's constitutional home rule provision, under which a city is free to write its own charter and define for itself what functions and powers, consistent with statutes and the constitution, its agencies will have. *Id.* at 580, 679 P.2d at 1336.

In *City of Springfield* v. *Washington Public Power Supply System,* 752 F.2d 1423 (9th Cir. 1985), the Ninth Circuit concluded that, under certain circumstances, a contract with take-or-pay provisions could in fact represent a purchase of electricity. The court scrutinized a three-party net billing agreement, also relating to WPPSS. The third party to the agreement was the Bonneville Power Administration (BPA), and the contract included a key provision not present in other cases: while the participants were obligated to pay WPPSS whether or not they actually received power from the project, they either received a refund from the BPA or credit for those payments as against power actually supplied by the BPA. Because the participants received either electricity or a cash refund equal to their payments to WPPSS, the court concluded that the underlying arrangement was in fact a contract for the purchase of electricity. *Id.* at 1429.

We hold that the lower court erred in concluding that 30 V.S.A. § 4002 empowered the Vermont participants to enter into the PSAs. Defendants argue, in the alternative, that certain other statutory sections contain implicit grants of such contracting power, but we need not consider this contention because we find the PSAs to be void on other grounds.

## II.

■ Under the provisions of the PSAs, all decision-making power with regard to the project rests with MMWEC; the Vermont participants retain no voice in decisions to incur debt, to commence operation of the plant, or to decommission the plant. They have abdicated all management responsibility for and have obtained no ownership interest in the project. Plaintiffs maintain that these provisions constitute an impermissible delegation of authority to MMWEC. We agree.

### A.

Our analysis begins with the agreements executed by the municipal participants. This Court has long adhered to the "deep-rooted principle of law that the delegate of power from the sovereign cannot without permission recommit to another agent or agency the trust imposed upon its judgment and discretion." *Thompson* v. *Smith,* 119 Vt. 488, 501, 129 A.2d 638, 647 (1957). In *Wabash Railroad* v. *City of Defiance,* 167 U.S. 88 (1897), the United States Supreme Court stated that "the legislative power vested in municipal bodies is something which cannot be bartered away in such manner as to disable them from the performance of their public functions." *Id.* at 100. In other words, "when authority to exercise the police power within a defined sphere is delegated by the state to a municipal or other public corporation, the authority is inalienable in the corporation, and it cannot in any manner be contracted away or otherwise granted, delegated, diminished, divided, or limited by the corporation." 6A E. McQuillin, Municipal Corporation § 24.41, at 116-17 (3d ed. rev. 1988).

Such authority is in the nature of a public trust conferred upon the legislative body of the corporation for the public benefit, and it cannot be exercised by others. *Arkansas-Missouri Power Co.* v. *City of Kennett,* 78 F.2d 911, 920 (8th Cir. 1935). Therefore, if a public corporation enters into a contract that barters away or otherwise restricts the exercise of its legislative or police powers, then the contract is ultra vires and void ab initio. *Byrd* v. *Martin, Hopkins, Lemon & Carter, P.C.,* 564 F. Supp. 1425, 1428 (W.D. Va. 1983), *aff'd,* 740 F.2d 961 (4th Cir. 1984); see also *Arkansas-Missouri Power Co.,* 78 F.2d at 922 ("any contract whereby legislative authority or duty is attempted to be delegated by a city is

absolutely null and void.") and 6A E. McQuillin, Municipal Corporations, at 117 ("contracts . . . which embarrass in any degree the municipal power of regulation of public affairs are ultra vires . . . .").

In executing the agreements at issue here, the Vermont municipalities violated the nondelegation doctrine in at least two ways.[2] First, each of the participants attempted to redelegate one of the most fundamental of its legislative powers: the spending power. Second, the municipalities' agreements regarding other liens on their revenues impermissibly restricted the future exercise of discretion and judgment by their legislative bodies.

"[U]nits of local government cannot by contract or otherwise barter away or surrender their essential legislative or police powers . . . ." *Byrd*, 564 F. Supp. at 1428; see also *Northwest Natural Gas Co.* v. *City of Portland*, 300 Or. 291, 304-06, 711 P.2d 119, 128 (1985) (municipality's power to act for the public's general welfare cannot be bargained away to a public utility). Here, each Vermont participant was presented with an opportunity to obtain — without capital investment — exclusive rights to a percentage of potentially available, inexpensive, electrical energy. But, as part of the substantial consideration required for this bargain, the participants bartered away the ability to exercise judgment and discretion regarding energy costs. "Where the exercise of judgment and discretion and the power to burden the public treasury have been so vested [in the municipality] by the Legislature, they may not be delegated wholesale." *Syrtel Buildings, Inc.* v. *City of Syracuse*, 78 Misc. 2d 780, 782, 358 N.Y.S.2d 627, 630 (Sup. Ct. 1974).

The express component of the municipalities' attempted delegation of spending authority is found in paragraph 3(a) of the uniform PSAs, which provides that:

_____

[2] The superior court treated this argument summarily, opining that "in view of 30 V.S.A. § 4002(5) this court concludes that there has been no improper delegation of utility management responsibility as a result of the PSAs." Subsection 4002(5) provides only that municipalities and cooperatives have "authority to otherwise do all lawful acts and things necessary or incidental to the exercise of the authority granted in this chapter." The superior court's citation of this provision begs the question of whether the delegations under the PSAs were lawful. Moreover, if such standard, statutory clauses were held to constitute legislative permission, then the "deep-rooted" nondelegation principle would be effectively extirpated from our jurisprudence.

> MWWEC, in good faith and in accordance with Prudent Utility Practice, shall . . . use its best efforts: (i) to arrange for the financing, planning, engineering, design, acquisition, construction, operation and maintenance of the Project; . . . and (iii) to issue and sell Bonds to finance the Costs of Acquisition and Construction of the Project, and to finance the costs of any necessary renewals, extraordinary repairs, replacements, modifications, additions and betterments for the Project. . . .

The purported delegation was made complete by the participants' failure to retain any vestige of control over decisions to incur debt. Under the provisions of the PSAs and the bond resolution, MMWEC has the sole power to establish budgets, revise those budgets, and fix the amount of the participants' monthly payments. Further, the authority to issue bonds resides in MMWEC alone, whether the bonds be for the costs of plant construction, operation, termination, or of "renewals, extraordinary repairs, replacements, modifications, additions and betterments . . . ." In sum, MMWEC makes all decisions to incur, or to refrain from incurring, project debt. Hence, MMWEC is given exclusive control over the magnitude of the participants' monthly payments and over the duration of these payments.

Defendants argue, in effect, that the attempted contractual delegation is permissible because MMWEC has substantial obligations to each of the participants under the PSAs. They note that MMWEC's duties to the Vermont participants are no different than its duties to Massachusetts participants and that MMWEC is obligated to act in accordance with prudent utility practice. This reasoning is flawed because no degree of contractual consideration — even an agreement to assume substantial obligations — can render a municipality's abdication of legislative power permissible. We also note that the Massachusetts participants have elected representatives on MMWEC's board of directors, while the Vermont participants retain no voice whatsoever in the management of the project.

The parameters of permissible redelegation by public corporations can be illustrated by contrasting two cases. In *Arkansas-Missouri Power Co.* v. *City of Kennett*, 78 F.2d 911, the Eighth Circuit considered the legality of a municipality's loan agreement

with the federal government that would enable the city to construct an electric power plant. Under the terms of the agreement, the federal government obtained a large amount of discretion and control over plans for the plant, labor contracts, and the use of materials. The court stated that:

> The building of an electric light plant obviously requires the exercise of judgment and discretion. . . . The duty to exercise that judgment is imposed upon the council of the city. We think that it may not contract that duty away or share it with others. That does not mean that it may not have plans and specifications prepared by architects and engineers, or that, when such plans have been finally approved by it, it may not let a general contract for the doing of the work and the furnishing of the materials. It does mean that in selling its bonds or otherwise financing the project, it may not delegate to the person who furnishes the money any substantial discretion with respect to the selection of labor or material to be furnished, or share with that person the authority to direct and control the construction.

*Id.* at 922. Because the federal government had retained "sufficient control . . . to insure that the money furnished would be spent in the way that the government thought it should be spent, whether that was in accord with the ideas of the city council or not," the court held that the city had impermissibly delegated its authority to build the plant. *Id.* at 923.

By way of contrast, the Supreme Court of Washington found no unlawful delegation of legislative of discretionary functions in *Roehl* v. *Public Utility Dist. No. 1,* 43 Wash. 2d 214, 239-40, 261 P.2d 92, 105 (1953). There, a consortium of five public utility districts employed an independent consulting engineer to assist them in operating a joint power supply system. In the course of dismissing an argument that the district commissioners had unlawfully delegated their powers, the court noted that the engineer was given no authority to make policy decisions of a legislative character and that he was not free to ignore the basic policies formulated by the commissioners. Instead, the engineer was to act as a consultant, prepare budgets, perform inventories and valuations, and act as an impartial fact-finder as between the individual districts. Although these duties required the exercise of judgment, the court concluded that they were administrative in

character and that no violation of the nondelegation principle had occurred. *Id.* at 241-42, 261 P.2d at 106.

The case at hand is closer to *Arkansas-Missouri Power* than it is to *Roehl*. As in the construction of a generating plant, arrangements aimed at ensuring long-term supplies of power require the ongoing exercise of legislative judgment and discretion. This is especially true where, as here, it is contemplated that the attempted arrangements may fail but where long-term financial obligations will be incurred nonetheless. The duty to exercise that judgment and discretion lies with the legislative bodies of the municipalities, and they cannot legally contract this duty away. The authority to spend the municipalities' revenues and the power to limit those expenditures must always be available for use in order that present and future needs may be met. See *Ericksen* v. *City of Sioux Falls,* 70 S.D. 40, 52-54, 14 N.W.2d 89, 95 (1944); 6A E. McQuillin, Municipal Corporations, at 117.

The participants also violated the nondelegation doctrine by agreeing to restrictions upon their power to make expenditures with regard to other projects or purchases. Paragraph 5(f) of the PSAs provides that:

> The Participant shall not issue bonds, notes or other evidences of indebtedness payable from and secured by a lien on the revenues derived from the ownership or operation of its electric system without providing for the payment of operating expenses (including Monthly Power Costs hereunder) from such revenues ahead of debt service on such bonds, notes or other evidences of indebtedness unless an independent consulting engineer . . . certifies that the facilities, for the financing of which the bonds, notes or other evidences of indebtedness are being issued, are . . . reasonably expected to properly and advantageously contribute to the conduct of the business of the electric system of the Participant in an efficient and economical manner consistent with prudent management.

Under an important corollary to the nondelegation principal, a public corporation may not enter into a contract that purports to restrict the future exercise of its legislative authority. See *Byrd,* 564 F. Supp. at 1428-29; *Illinois Power & Light Corp.* v. *City of Centralia,* 11 F. Supp. 874, 885 (E.D. Ill. 1935), *rev'd on other*

*grounds,* 89 F.2d 985 (7th Cir. 1937); *Barton* v. *Atkinson,* 228 Ga. 733, 744, 187 S.E.2d 835, 843 (1972); and *City of Louisville* v. *Fiscal Court of Jefferson County,* 623 S.W.2d 219, 224 (Ky. 1981); cf. *Pierce Oil Corp.* v. *City of Hope,* 248 U.S. 498, 501 (1919) (where public welfare is involved, a contract not to legislate would have no effect). By agreeing to the contractual provisions above, the participants have fettered the future exercise of the authority granted to then under the provisions of 24 V.S.A. § 1822 and other municipal utility financing statutes. In the not unlikely event that a participant should wish to commit a portion of its revenues to acquire energy supplies or facilities in the future, it would have to either: (1) give priority to the monthly payment to MMWEC, or (2) obtain the certification of an independent engineering consultant regarding the advisability of the acquisition. The first option would hinder any prospective financial arrangement because of MMWEC's priority, and either option would deny the free exercise of legislative discretion.

The assignment of proprietary functions, such as plant operation, to MMWEC may be permissible, but the effective transfer of the municipalities' spending power and the restrictions upon their ability to incur other debts constitute impermissible attempts to redelegate legislative authority.[3] Therefore, the municipalities' execution of the PSAs was ultra vires, and these contracts were void ab initio.

### B.

■ We next consider the enforceability of the PSAs executed by the electric cooperatives, VEC and WEC. The nondelegation principle outlined in the foregoing discussion applies to municipalities and "other public corporation[s]." 6A E. McQuillin, Mu-

---

[3] We note that 30 V.S.A. § 605 authorizes the Village of Lyndonville to enter into utility contracts containing provisions for "arbitration, delegation and other matters deemed necessary or desirable to carry out their purposes." This language cannot be characterized as legislative permission to delegate the spending power, however, even assuming that such permission would be effective. It appears to refer only to delegation of tasks to third parties. Legislative permission to redelegate granted authority must be specific: " 'A legislative power granted to a municipal corporation cannot be parted with unless such was the clear intent of the legislature, . . . . The authority to surrender the power must appear from "the clear letter of the law." ' " *Arkansas-Missouri Power Co.,* 78 F.2d at 921 (quoting *National Water Works Co. of New York* v. *City of Kansas,* 20 Mo. App. 237, 242 (1886).

nicipal Corporations, at 116. Although electric cooperatives are not public corporations in the technical sense of that term, we hold that their agreements with MMWEC are void nonetheless.

"[S]trictly speaking, a public corporation is one that is created for political purposes with political powers to be exercised for purposes connected with the public good in the administration of civil government." 1 Fletcher Cyclopedia of Corporations § 58, at 579 (rev. ed. 1983). In contrast, "quasi-public corporations" are private corporations to which the state has granted a secondary franchise involving the performance of public duties. *Id.* § 63, at 600. Investor-owned public service corporations organized for profit, including gas and light companies, are deemed to be quasi-public corporations. *Id.* at 602.

The corporate structures of VEC and WEC comport with neither of the above definitions and fall somewhere between the classifications "public" and "quasi-public." These cooperatives were not created under the Vermont Business Corporation Act; instead, they were organized pursuant to chapter 81 of Title 30, under which the power to provide electrical energy is the primary franchise granted by the state. They are nonprofit, nonstock corporations created for a single, governmental purpose: the provision of electrical energy to rural areas. Significantly, chapter 81 and its statutory predecessors allowed cooperatives to adopt a role formerly held by a state agency, known as the Board of Rural Electrification, which had similar powers. See An Act to Promote Rural Electrification, No. 116, 1943 Vt. Laws 161.

The cooperatives' membership requirement distinguishes them from purely public corporations, but this characteristic is simply an organizational device made necessary by the lack of a municipal structure. "It is contemplated in both [municipal corporations and cooperatives] that all the inhabitants in the described territory shall be eligible to obtain the service by complying with the reasonable conditions." *Bookhart* v. *Central Electric Power Coop.*, 219 S.C. 414, 427, 65 S.E.2d 781, 786 (1951) (citing *State ex. rel. Wood* v. *Consumers Gas Trust Co.*, 157 Ind. 345, 352, 61 N.E. 674, 677 (1901)). Here, although VEC and WEC provide electricity to members only, their bylaws provide that "any person" may become a member, and, in effect, such membership depends only upon an agreement to purchase electricity from the cooperative.

The courts have disagreed on the extent to which electric cooperatives can be characterized as public or governmental in nature. Cf. *Bookhart,* 219 S.C. at 427-28, 65 S.E.2d at 786 (legislature plainly intended to make electric cooperatives public corporations rather than private) with *City of Paris* v. *Federal Power Commission,* 399 F.2d 983, 986 (D.C. Cir. 1968) (electric cooperatives not government instrumentalities). Even on the question of whether such cooperatives are public utilities, there is a split in authority: most cases on that question are concerned with the jurisdiction of the respective state regulatory commissions, see, e.g., *Garkane Power Co.* v. *Public Service Commission,* 98 Utah 466, 100 P.2d 571 (1940), or the power of eminent domain, see, e.g., *Dairyland Power Coop.* v. *Brennan,* 248 Minn. 556, 82 N.W.2d 56 (1957). Those questions are not before us here, but we observe that VEC and WEC are subject to supervision and regulation by the Public Service Board, 30 V.S.A. § 2(a)(12), and that both have the power of eminent domain, *id.* at § 3002(15). We note that the contracting powers of public utilities are constrained by state authority: "A public utility has the right to enter into a private contract but the state can modify that contract when it falls outside the parameters of an appropriate standard." *Afton Energy, Inc.* v. *Idaho Power Co.,* 111 Idaho 925, 929, 729 P.2d 400, 404 (1986).

It is at least arguable that the nondelegation doctrine prohibits even quasi-public corporations from redelegating powers granted to them in connection with their secondary, public service franchises. One court has applied the nondelegation doctrine in a case involving several public utility districts — which are analogous to cooperatives in many respects — after designating them as quasi-municipal corporations. See *Roehl,* 43 Wash. 2d at 239-42, 261 P.2d at 105-06; see also *Conley* v. *Union County Peoples' Utility Dist.,* 182 Or. 565, 187 P.2d 150 (1947) (invoking nondelegation principle to invalidate agreement between public utility district and electric cooperative).

We need not debate this question further, however, nor resolve the underlying definitional problem, because even private corporations have certain limitations upon their power to delegate authority. The state grants corporate powers to private entities upon the assumption that the powers will be exercised by the corporation's elected officers and not by the officers of another corporation. *Sherman & Ellis, Inc.* v. *Indiana Mutual Casualty Co.,* 41 F.2d 588, 591 (7th Cir. 1930). Under the well-settled rule,

" '[c]ontracts are ordinarily void . . . which have the effect of withdrawing from the directors the control and direction of corporate affairs, business and management, which is vested in them by law. . . . and an agreement by which the . . . directors . . . abdicate or bargain away in advance the judgment which the law contemplates they shall exercise over the affairs of the corporation is void.' " *Milton Frank Allen Publications, Inc.* v. *Georgia Assoc. of Petroleum Retailers, Inc.,* 224 Ga. 518, 528, 162 S.E.2d 724, 730 (1968).

Although this precept echoes, to a degree, the elements of the nondelegation principle, it is not based upon considerations of sovereignty. Instead, the rule springs from the fiduciary relationship between the corporate directors and the shareholders: "Directors of a corporation are regarded as fiduciaries and are required to exercise their own independent judgment for the highest welfare of the corporation and its stockholders." *Stoneman* v. *Fox Film Corp.,* 295 Mass. 419, 425, 4 N.E.2d 63, 66 (1936). It is true that the courts have been flexible in allowing delegation of authority by boards of directors where necessary or expedient. *Boston Athletic Ass'n* v. *International Marathons, Inc.,* 392 Mass. 356, 365, 467 N.E.2d 58, 63 (1984). Yet, at a minimum, there are certain powers and duties that cannot be delegated indefinitely to outsiders. *Sherman & Ellis,* 41 F.2d at 590.

With respect to electric cooperatives, we believe that one of these inalienable powers is the spending authority. Too broad a delegation of power, either express or implied, becomes an unlawful abdication of management functions by the board of directors. *Fournier* v. *Fournier,* 479 A.2d 708, 712 (R.I. 1984). In the instant case, the attempted transfer of essentially unlimited spending authority would have accomplished this degree of delegation. 30 V.S.A. § 3013 dictates that "[t]he business of a cooperative shall be managed by a board of not less than five trustees . . . ." But, when VEC and WEC executed the PSAs, they effectively transferred to MMWEC the unlimited power to determine a substantial portion of their monthly costs for a protracted and interminable period of time. Moreover, the cooperatives also agreed to restrictions upon their future power to issue bonds, and other evidences of indebtedness, secured by liens on their revenues. Because these agreements would have operated to restrict the freedom of the trustees to manage corporate affairs, they are illegal

and void. See *Triggs* v. *Triggs*, 46 N.Y.2d 305, 309, 385 N.E.2d 1254, 1255, 413 N.Y.S.2d 325, 326 (1978). We hold that, whether VEC and WEC are treated as public or private corporations, the execution of the PSAs at issue here was beyond their powers.

## III.

Our resolution of this appeal on delegation grounds renders consideration of plaintiffs' arguments regarding municipal and co-operative indebtedness unnecessary. Woven through the contentions of defendants and amicus, however, is a recurring theme that requires some comment. Defendants and the Vermont League of Cities and Towns urge that the practical and legal consequences of a decision voiding the PSAs should be considered by this Court. First, defendants maintain that the Supreme Court of Washington's decision in *Chemical Bank,* 99 Wash. 2d at 784, 666 P.2d at 335, voiding similar contracts between utilities and WPPSS, has created doubts about municipal borrowing authority, generated frequent test cases, and produced bizarre rulings by the lower courts. Second, defendants point out that the Washington municipalities that were released from the WPPSS contracts are now defending massive securities fraud lawsuits. We are no more influenced by these considerations than we are by plaintiffs' emphasis on the immensity of the financial burden imposed by the agreements or by the fact that no power has yet been produced — and may never be produced — by the project. Our courts are courts of law and will deal with the legal ramifications resulting from our holding; policy considerations are for the legislature.

## IV.

Finally, defendants point out that they raised the affirmative defenses of estoppel, res judicata, and fundamental fairness in the Court below and that these issues were not ruled upon as part of the summary judgment. Hence, they maintain, this Court should remand the case to the superior court for further proceedings. Our holding that the PSAs are ultra vires and void ab initio obviates any such necessity.

Contracts that are ultra vires "are wholly void and not merely voidable; . . . the corporation is under a perpetual disability to make them . . . cannot be estopped from making the defense of

*ultra vires . . . ."* *Metropolitan Stock Exchange* v. *Lyndonville National Bank,* 76 Vt. 303, 308, 57 A. 101, 102 (1904); see also *California Pacific Bank* v. *Small Business Administration,* 557 F.2d 218, 223 (9th Cir. 1977) (party cannot be estopped from raising defense of illegality in a contract action, and the court is duty bound to raise the issue sua sponte). " 'The nonenforcement of illegal contracts is a matter of common public interest, and a party to such contract cannot waive his right to set up the defense of illegality in an action thereon by the other party. . . . Validity cannot be given to an illegal contract through any principle of estoppel.' " *Sherwood & Roberts-Yakima, Inc.* v. *Leach,* 67 Wash. 2d 630, 639, 409 P.2d 160, 165 (1965) (quoting *Reed* v. *Johnson,* 27 Wash. 42, 55, 67 P. 381, 386 (1901)). We believe that this is equally true of arguments regarding the kindred doctrine of res judicata. This doctrine is not derived from statutory or common law; it is merely a "judicial reflection of public policy favoring one fair trial *on the merits . . .* as an expedient in the administration of public justice." *In re Skyline Lumber Co.,* 311 F. Supp. 112, 115 (W.D. Va. 1970) (emphasis in original). The PSAs at issue here were void ab initio, and the invocation of judicial or equitable doctrines cannot now breathe life into them.

*The superior court's grant of defendants' motions for summary judgment is reversed and judgment for plaintiffs is entered.*