**Supreme Court**

No. 2012-141-Appeal.
(PC 02-2785)

Langdon Wilby et al.                    :

            v.                          :

Paul Savoie, Alias.                     :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Langdon Wilby et al.                    :

v.                    :

Paul Savoie, Alias.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**    The plaintiff, Paul Savoie, appeals from a November 14, 2011 judgment in favor of the defendants, Langdon Wilby and Tammy Emmett.[1] The plaintiff and the defendants were members of the board of directors of Green Mountain Park, Inc., a Vermont corporation formed for the purpose of reconstructing, reviving, and operating a defunct horseracing facility in the Town of Pownal, Vermont.  The plaintiff invested $350,000 in the venture before the project was ultimately abandoned due to issues surrounding the corporation's ability to obtain a racetrack license.  The plaintiff brought claims against the defendants for breach of fiduciary duty,[2] breach of contract, and fraud.  At the conclusion of a bench trial in Superior Court, the trial justice entered judgment for the defendants on all counts. For the reasons set forth herein, we affirm the judgment of the Superior Court.

---

[1] This lawsuit was initially brought by Emmett and Wilby against Savoie; however, this appeal solely concerns the judgment on Savoie's counterclaims.   Therefore, we will refer to Savoie as the plaintiff, and Wilby and Emmett shall be referred to as the defendants.
[2] Count 1 of Savoie's amended counterclaim is titled "negligence"; however, the specific allegations relate only to the execution of Wilby's and Emmett's fiduciary duties to the corporation and/or to Savoie as a shareholder.

- 1 -

# I

## Facts and Procedural History

### The Racetrack Property

In early 1997, Marcus Vitali, a horse trainer, became aware that an unused racetrack facility in the Town of Pownal, Vermont was available after being closed for nearly a decade. Vitali told an acquaintance, Langdon Wilby, about the racetrack and presented the idea of rehabilitating the facility. Wilby had been working in the restaurant industry for approximately thirty years, and he owned a restaurant called "Lang's Villa Rosa"[3] in Massachusetts. Wilby had no experience developing, managing, or running racetracks prior to the beginning of this particular venture. After discussing the potential project, Vitali and Wilby visited the racetrack facility and met with the owner of the property, Mr. Tietjen.[4]

It is not clear whether Vitali or Wilby ever executed a lease agreement regarding the racetrack property. According to Wilby, there was first an "oral commitment" in the spring of 1997 and then a signed lease for the racetrack premises the following summer.[5] The oral agreement allegedly gave Wilby and Vitali permission to take possession of the premises, on the condition that they would receive a racing license. Vitali also testified that he and his wife, Tammy Emmett, and Wilby reached an "agreement" with Tietjen in 1997, which was signed and reduced to writing. No written lease was produced at trial. At some point in 1997, Wilby and Vitali, along with two other acquaintances, Gary Owens and Paul Rizzo, began working to

---

[3] At trial, Wilby's restaurant was referred to variously as "Lang's Villa Rosa," "Lang's Villa," and "the Villa Rosa." We shall call it "Lang's Villa Rosa."

[4] According to Vitali, the racetrack was owned by "George Tietjen." According to Wilby, this person was "John Tietjen." The trial justice's decision refers to the owner as "Mr. Tiegens." We shall refer to him as "Tietjen."

[5] In his deposition, however, Wilby stated that there was never a written lease. Also, on July 17, 1998, Wilby's attorney sent him a letter in which he indicated that he had not heard anything about a lease agreement with the racetrack owners.

rehabilitate the racetrack property. Vitali supervised the project and was in charge of hiring and billing. Owens and Rizzo held managerial positions.[6]

### The Corporation

On July 21, 1997, Wilby and Emmett formed a Vermont corporation called Green Mountain Park, Inc. (Green Mountain), for the purpose of "conducting thoroughbred and other horse racing and the simulcasting of same at lawfully licensed establishments." The articles of incorporation listed three directors: Wilby, Emmett, and Ralph A. Foote, who was also the corporation's legal counsel. Wilby served as President and Treasurer of Green Mountain, and Emmett was Vice President and Secretary. Vitali chose not to be involved in the corporation as a stockholder, director, or officer, because he did not want his career as a horse trainer to be jeopardized in the event that the corporation's racing license was denied. Vitali testified that Emmett, his wife, "agreed to be part of the venture and step in." According to Wilby, Vitali made the decisions for Emmett's share of the corporation. Emmett testified that Vitali was authorized only to perform work that she had assigned to him, but she could not recall at trial any specific duties or tasks that she had so assigned.[7]

### Savoie's Involvement in Green Mountain Park, Inc.

Wilby, Vitali, and Emmett began to look for investors in the summer of 1997. Vitali had known Paul Savoie, a former Pawtucket firefighter, for many years. Vitali, knowing that Savoie had been previously involved in dog racing, thought that Savoie might be interested in participating in the new racetrack venture. Vitali introduced Savoie to Wilby in late 1997 or

---

[6] According to Wilby, Owens served as general manager of the racetrack beginning in May 1997, and Rizzo was the assistant general manager. In a Small Business Plan submitted to the Vermont racetrack licensing commission, however, Owens was listed as the corporation's "Chief," and Rizzo was listed as "General Manager."

[7] Emmett also testified that she suffered from a "brain hemorrhage" and that her memory had been affected as a result.

early 1998 at Lang's Villa Rosa. A couple of weeks after Savoie met Wilby, Savoie agreed to invest $350,000 in the enterprise. Wilby testified that he met with Savoie approximately fifteen to twenty times prior to the time when Savoie made his investment. Savoie testified, in contrast, that they had only "[t]wo or three" meetings. Vitali estimated that he met with Savoie seven times prior to Savoie's investment, and Emmett testified that she met with Savoie at least once.

Savoie testified that, prior to investing, he did not ask Wilby or Vitali about financial matters, nor did he inquire about their business plan, the prospective purchase of the racetrack property, or any lease arrangements. Savoie also testified that he did not ask about any preliminary work that had been done on the racetrack, did not ask to see any records, and did not know whether the company had been incorporated. Savoie also did not ask whether Wilby or Emmett had any prior experience with racetracks. Savoie was aware that Vitali was a horse trainer and that Emmett owned a horse farm. According to Wilby, Savoie was also aware that Vitali would essentially be in charge of the racetrack operation even though he was not a formal member of the company. Savoie also knew that Wilby and Emmett had hired Attorney Foote as their legal counsel, but he did not attempt to contact Attorney Foote prior to investing.

Savoie testified that he visited the racetrack property once before he invested and observed that it was "kind of run down." Later on, however, Savoie testified that he could not recall whether he visited the property before investing. Vitali testified that Savoie went to the racetrack once before making his investment and that he "never really asked a lot of questions." When asked at trial, "what did you do for due diligence before issuing the check for $350,000?" Savoie replied, "I didn't do anything."

Prior to making his $350,000 investment, Savoie met with his brother, Robert, who worked as a financial analyst. This meeting was arranged by Wilby and Vitali. Savoie told

Robert that he "had an opportunity to own part of a racetrack" and that he intended to invest $350,000. Savoie first testified that Robert did not express an opinion regarding the investment. Later during trial, however, Savoie stated that his brother told him that "he didn't really think [the investment] was a good idea."

According to Savoie, Wilby and Emmett both told him that they would invest $175,000 in the racetrack venture; however, they actually invested only $100,000 each, a few days after Savoie made his initial deposit of $350,000 into a new bank account opened for Green Mountain at Vermont National Bank. Savoie received a one-third equity interest in the corporation in exchange for his monetary investment, with Wilby and Emmett holding the other two-thirds.[8]

At the first shareholders meeting, held on April 9, 1998, Savoie was elected to the board of directors, and Attorney Foote resigned.[9] The corporate minutes also indicate that Wilby was elected President and Treasurer, and Emmett was elected Vice President and Secretary. Wilby testified that his duties as President were to oversee the general activities of the racetrack and that, as Treasurer, he was responsible for "checking the books."[10] Wilby testified that Vitali handled the payroll for the corporation and was in charge of the petty cash. Emmett testified that she held the positions of Secretary and Vice President, although she also stated that Savoie replaced her as Vice President at some point during the venture. Emmett testified that she believed she "had no responsibilities" in the development of the business.

---

[8] Wilby, Emmett, and Savoie were the only shareholders of Green Mountain, with 10,000 shares apiece.

[9] The minutes from this meeting also indicate that the board of directors resolved to treat Green Mountain "as a small business corporation for income tax purposes." However, there is no indication that any action was taken as a result of this resolution, and the corporation never filed income tax returns.

[10] When deposed prior to trial, however, Wilby stated that he "never had any responsibilities" as Treasurer.

Savoie testified that he never served as an officer of Green Mountain. According to Wilby, however, Savoie served as Vice President of the corporation starting in the spring of 1998. Wilby did not produce any records to support this assertion. Wilby also testified that Savoie was elected Secretary of the corporation shortly after he became involved in the business. Savoie was identified as "Secretary" in a Small Business Plan submitted to the Vermont licensing commission.[11]

The parties presented conflicting testimonies regarding the extent of Savoie's presence at the racetrack in 1998 and early 1999. According to Savoie, he visited the racetrack only "[o]n one or two occasions" after he made his investment and stayed overnight "once or twice." Savoie testified that he spent a total of "four or five" days at the racetrack between the spring of 1998 and February 1999. Savoie contended that he did not help with the racetrack rehabilitation project, was not assigned any responsibilities in developing the company, and did not attend any formal meetings to discuss the development of the venture.[12] Savoie did testify, however, that each time he visited the racetrack he would go to "the deli across the road," which was owned by James Winchester, who was also a member of Green Mountain's board of directors. Savoie also testified that, when he went to the track, he would spend the day with Doug Saunders, who had

---

[11] Wilby was unable to reconcile the difference between the corporation's Small Business Plan, which listed Savoie as Secretary, and the minutes of the April 1998 meeting that listed Emmett as Secretary.

[12] Roger R. Nolette, a friend of Savoie since the early 1970s, testified that he was a Eucharistic Minister at a parish of which Savoie's mother was a member in 1998. Nolette testified that he and Savoie had a practice of delivering communion to Savoie's ill mother in the Town of Bristol, Rhode Island, approximately once a week throughout some or all of 1998. Nolette testified that this activity did not occur on the same day each week, and that he would call Savoie between twenty-four and forty-eight hours in advance to schedule the meetings. Nolette did not recall Savoie ever telling him that he was unavailable because he was in Vermont. Nolette also testified that he and Savoie had a tradition of gathering with friends at a bar in the City of Pawtucket, "on just about a daily basis" throughout the year in 1998.

been hired as the head of racetrack security.[13] Savoie, Wilby, and Vitali all testified that Savoie kept an antique car at the racetrack.

Wilby, on the other hand, testified that he saw Savoie "at least five times a week," either at Lang's Villa Rosa or at the racetrack, after Savoie made his investment. Wilby stated that, "I [Wilby] used to go up on a Monday and Tuesday and [Savoie] was there almost all summer long when I went up." Wilby also testified that Savoie would go to the hardware store, that "[h]e spent time over at the deli," and that he would stay overnight in the jockeys' room. According to Vitali, "[Savoie] was there a lot. I [Vitali] can't say how often, but he was there quite a bit, you know, we were working. He would come floating through, walking around, you know, he had his car downstairs. He was around quite often. He'd stay in the jockey[s'] room." According to Vitali, Savoie would "stay a couple of days, go home, and come back." Vitali testified that Savoie was "absolutely" present at the track more than four or five times in 1998.

### The Checks

At some point in 1997, Vitali began hiring local workers to perform renovations on the racetrack property, paying them first in cash and then with checks drawn from the account of his and Emmett's business, Country Side Farms.[14] Vitali testified that, when he paid workers in cash, he did not obtain receipts. In the spring of 1998, Green Mountain opened a business account at Vermont National Bank with an initial deposit of Savoie's $350,000, followed shortly by Wilby and Emmett's $200,000.

More than 250 checks drawn on the Green Mountain account were introduced into evidence at trial. The checks were made out to various payees, including "Villa Rosa" (Wilby's

---

[13] Wilby described Saunders as Tietjen's "right-hand man."

[14] Emmett testified that Country Side Farms was a horse boarding facility located in Massachusetts that also provided horse-riding lessons. Country Side Farms had its own checking account in 1997, on which Emmett and Vitali were authorized signatories.

restaurant) and "Country Side Farms" (Vitali and Emmett's horse farm),[15] and they all contained what purported to be Savoie's, Wilby's, and Emmett's signatures. Some of the checks contained memos indicating that the funds were spent on racetrack-related expenditures, while others had blank memos or merely contained the word "loan." At trial, Savoie recalled signing only some of these checks and said he did not recognize all of the various payee names. Savoie testified that he had signed blank checks on behalf of Green Mountain during the course of the business venture because Wilby had asked him to do so. Savoie also testified that he did not authorize anyone to sign his name on checks drawn from the Green Mountain account. Vitali testified that he wrote the signatures on some of the checks, although Wilby, Emmett, and Savoie were the only authorized signatories on the account. Wilby and Emmett testified that they had given Vitali permission to execute their signatures; according to Vitali, he also had permission to sign Savoie's name.

Vitali testified that he kept a "ledger" of the money that was spent on rehabilitating the racetrack. Vitali stated that his practice was to make a note of each check that he wrote, either on the ledger or on "a piece of paper or pad in my office, * * * or I'd use my checkbook, whatever." Vitali's ledger was included as a trial exhibit, and it contained more than 250 handwritten entries indicating payments with corresponding check numbers.

### Attorney Foote's Concerns

Wilby received a letter from Attorney Foote dated August 5, 1997, in which Attorney Foote advised Wilby that Green Mountain's racing-license application must indicate whether any officers of the corporation had ever been arrested. Wilby testified that he had in fact been

---

[15] Emmett testified that Vitali sometimes used Country Side Farms checks for Green Mountain expenses. Emmett also "vaguely" recalled checks being made out from Green Mountain to Country Side Farms, and that these checks were for "[a] multitude, just payroll, materials, and whatever it was that [Vitali] paid out" at Green Mountain.

arrested in 1971, but that he had forgotten about this arrest when he received the letter from Attorney Foote.[16]  On August 19, 1997, Wilby and Emmett filed an "Application for License to Conduct Horse Race Meets with Pari-Mutuel Wagering" with the Vermont Racing Commission, on behalf of Green Mountain.  The application contained the following question: "Has any officer, director, stockholder, or any employee of the corporation been arrested at any time for other than a minor traffic violation?"  The applicants checked the box for "no" in response to this question.

Wilby received another letter from Attorney Foote dated December 10, 1997, in which Attorney Foote indicated that he was "not optimistic" about how the commission would react to Green Mountain's application.  This letter indicated that Attorney Foote was concerned about Green Mountain's financial capacity.[17]  Green Mountain also submitted a "Proposal" to the Vermont Racing Commission that contained estimated costs for the construction and renovation of the racetrack facility, with a total projected cost of $1,300,000.  Additionally, Attorney Foote sent a "Memorandum for Lang Wilby" to Rizzo on January 10, 1998, in which he indicated that the commission "would want to know precisely where we planned to obtain the 1.3 to 1.5 million we had estimated it would cost to restore the track."  Attorney Foote's memorandum did not contain a breakdown of this estimate.  Wilby testified that, upon receiving this memorandum, he assigned Vitali the task of "looking into" the corporation's financial issues.

---

[16] Wilby testified that he had been arrested, charged, tried, and convicted on charges of aiding and abetting and moving stolen property.

[17] The letter stated, in part:

> "Very frankly I am not optimistic as to what [the Commission's] reaction is going to be.  However we have done, as far as I can see, all we can do and if we don't have enough to assure them it can work it may be a fair signal that the risks involved exceed any to which you should be exposing yourself."

Wilby did not tell Savoie about Attorney Foote's letters and memorandum before Savoie became an investor. Savoie testified that, if he had known that Attorney Foote had raised concerns about persons being arrested and/or charged with crimes, he would not have invested in the corporation. Additionally, Savoie asserted that he would not have invested had he known about the financial concerns raised in Attorney Foote's memorandum. Savoie also testified, however, that he did not ask to see any corporate records, did not ask about the corporation's financial situation, and did not attempt to contact Attorney Foote before making his investment.

**Savoie's and Wilby's Criminal Records**

Savoie testified that he met with officers from the Vermont State Police in the summer of 1998, during the course of the police investigation of the principals involved in the racetrack venture. Savoie told the officers that he had a criminal record, specifically that he had pled guilty to a currency-violation charge in Vermont in 1980 and served sixty days in jail.[18] Savoie testified that he told Wilby about his criminal record before he invested in the racetrack venture, because he "knew we would be investigated," and Wilby told him "not to worry about it." Wilby, however, did not recall this conversation. Savoie did not ask, prior to investing, whether Wilby had a criminal record.

Wilby was also interviewed by the Vermont State Police in 1998, and the police asked whether he had a criminal record. After first denying that he had a record, Wilby eventually told the investigating officers that he had been charged in relation to an incident involving stolen property and had served one year of probation in 1970 or 1971. Wilby then told Savoie that the police had discovered his record, and Savoie told Wilby that he had also been investigated. Wilby testified that he, Savoie, Owens, and Vitali had a meeting with Attorney Foote at the

---

[18] Savoie also testified that he had a second meeting with the Vermont State Police, but he could not recall any details about the encounter.

- 10 -

racetrack, at some point in the beginning of 1999, for the purpose of discussing Wilby's and Savoie's criminal records.

## The License Application Withdrawal

In February 1999, Green Mountain submitted a "Withdrawal of Application for License to Conduct Horse Races or Meets with Pari-Mutuel Wagering" to the Vermont Racing Commission.[19]   This document stated two reasons for the withdrawal: an issue with "construction of a suitable sanitation plant," and fire-code-compliance reconstruction that would cost "between 1.2 and 1.9 millions of dollars."[20]

The parties disputed whether Savoie was involved in the decision to withdraw Green Mountain's license application.  Wilby testified that in early 1999 there was a meeting at the racetrack, at which Wilby, Vitali, Rizzo, Attorney Foote, and Savoie were present, and the decision was made to withdraw the license application.  According to Wilby, Savoie was involved in the discussions that led to this decision.  No records or minutes were produced from any meetings having to do with the withdrawal.  Emmett testified that she was involved in a meeting in which the withdrawal decision was made, along with Vitali, Wilby, and Savoie. Emmett testified that she understood that the reason for the withdrawal was that Savoie's and Wilby's criminal records had "come to light," and they thought it better to withdraw rather than be denied.

Vitali also recalled that there was a meeting concerning the Vermont State Police investigation.  Vitali testified that Emmett and Savoie were present at this meeting, and the purpose was to discuss the severity of the criminal records with Attorney Foote.  As a result of

---

[19] Green Mountain had submitted its racing license application in August 1997.
[20] Wilby testified that Owens had been responsible for establishing this numerical estimate. Wilby also testified that he was unsure of exactly how Owens had arrived at the estimate, and he said he did not make any inquiries about it.

that meeting, according to Vitali, the decision was made to withdraw the application. Vitali testified that it was understood that the commission was going to deny the application because of Wilby's and Savoie's criminal records. Vitali also testified that, at the time of the withdrawal, there were issues with the racetrack's septic system and fire-code compliance.

Savoie, on the other hand, testified that he did not participate in any meetings in which the withdrawal of the license application was discussed and was never given an opportunity to vote on the matter. Savoie stated that, in February 1999, Wilby informed him at Lang's Villa Rosa that the racetrack venture was no longer going to be pursued because the license application had been denied. Savoie testified that he did not ask Wilby why the application had purportedly been denied.

### The Final $100,000

After the license application was withdrawn, $100,000 remained in Green Mountain's bank account. According to Savoie, he and Wilby agreed to invest this money in the stock market.[21] Wilby "had a guy" who would invest the money; Savoie did not recall who this person was. Savoie did not know where the $100,000 was invested, and he did not ask. Wilby testified that he invested the money in the stock market, and that $62,000 was subsequently lost. Wilby could not recall the name of the brokerage firm or the last name of the broker, and he produced no records detailing this investment. At some point in 1999, Wilby and Vitali gave Savoie a check for the remaining $38,000, with the understanding that Savoie would invest it with his brother, Robert. Savoie's brother refused to take the check or become involved, and Savoie deposited the check into his personal account at Pawtucket Credit Union.

---

[21] Savoie also testified inconsistently, however, at one point stating that he was reluctant to make this investment.

**The Lawsuit**

Wilby and Emmett filed a complaint against Savoie in Superior Court on May 29, 2002, seeking an accounting of the $38,000 that was supposedly invested on their behalf. Savoie counterclaimed for breach of fiduciary duty,[22] fraud, and breach of contract, seeking $312,000 in damages.[23] Wilby and Emmett's complaint was dismissed for failure to comply with discovery, and the case proceeded to trial on Savoie's counterclaims. After a five-day bench trial, judgment was entered for Wilby and Emmett on all counts. Savoie filed a timely appeal to this Court.

## II

### Standard of Review

"Rule 52(a) of the Superior Court Rules of Civil Procedure requires a trial justice in a nonjury * * * case 'to make specific findings of fact upon which he [or she] bases his [or her] decision.'" Connor v. Schlemmer, 996 A.2d 98, 109 (R.I. 2010) (quoting Nardone v. Ritacco, 936 A.2d 200, 206 (R.I. 2007)). "Rule 52(a) further requires a trial justice to 'find the facts specially and state separately its conclusions of law thereon * * * .'" Id. (quoting Rule 52(a)). The trial justice, however, "need not engage in extensive analysis to comply with this requirement." Id. (quoting Nardone, 936 A.2d at 206). "This Court has 'recognized that [a] trial justice's analysis of the evidence and findings in the bench trial context need not be exhaustive, [and] if the decision reasonably indicates that [he or she] exercised [his or her] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law.'"

---

[22] As previously mentioned, this count was titled "negligence" in plaintiff's amended counterclaim.

[23] Savoie also sought interest, costs, reasonable legal fees, and punitive damages.

Notarantonio v. Notarantonio, 941 A.2d 138, 144-45 (R.I. 2008) (quoting McBurney v. Roszkowski, 875 A.2d 428, 436 (R.I. 2005)).

Furthermore, "[i]t is well settled that [t]his Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence * * * ." Reagan v. City of Newport, 43 A.3d 33, 37 (R.I. 2012) (quoting Notarantonio, 941 A.2d at 144). On review, "[w]e accord great weight to a trial justice's determinations of credibility, which, inherently, 'are the functions of the trial court and not the functions of the appellate court.'" Cullen v. Tarini, 15 A.3d 968, 976 (R.I. 2011) (quoting Raheb v. Lemenski, 115 R.I. 576, 579, 350 A.2d 397, 399 (1976)). If "the record indicates that competent evidence supports the trial justice[']s findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." Reagan, 43 A.3d at 37 (quoting Notarantonio, 941 A.2d at 144). We will, however, review questions of law de novo. Cullen, 15 A.3d at 977.

## III

### Discussion

The plaintiff raises three issues on appeal:

> "1. Whether the trial court committed reversible error when it failed to address plaintiff's claim that defendants fraudulently induced him to invest in Green Mountain by misrepresenting their lack of legal right to the track premises and by withholding material information * * * .
>
> "2. Whether the trial court committed reversible error when it concluded that defendants breached their fiduciary duty by failing to keep proper account of Green Mountain funds, but then failed to hold defendants responsible for their failure to account * * * .
>
> "3. Whether the trial court failed to do substantial justice between the parties, made clear errors of fact, drew unreasonable inferences

- 14 -

from the evidence and overlooked and misconceived material evidence when it concluded that plaintiff knew of defendants' mismanagement of Green Mountain and that plaintiff and defendants had equal responsibility for Green Mountain's failure * * *."

We will address each of plaintiff's proposed issues in turn. The parties agree that Vermont law controls the substantive legal issues in this case.

## A

### Failure to Address Fraud and Fraudulent Concealment Claims

The plaintiff argues that the trial justice erred by "d[oing] and sa[ying] nothing whatever concerning swaths of plaintiff's fraud claim." First, plaintiff argues that defendants induced plaintiff to invest in Green Mountain and led him to believe that he would be a part owner of the racetrack property, when in fact the corporation did not have any ownership rights to convey. According to plaintiff, "an offer to sell shares in a venture designed to develop a physical premises includes an implicit representation that the offeror has some form of legal right to the premises into which the investor's money is to be poured." The plaintiff contends that the trial justice found that defendants did not have a written lease for the racetrack property, "but failed then to draw the required legal conclusion: that, when defendants implicitly led plaintiff to believe that they had an interest in the track, they materially misled him."

Next, plaintiff argues that the trial court entirely "disregarded" his claim of fraudulent concealment. The plaintiff claims that the trial justice erred by failing to address the issue of whether defendants had a legal duty to disclose information they had learned about the business prior to plaintiff's involvement. The plaintiff argues that defendants had a "duty to disclose material information" to him, because they had been involved in the racetrack venture for approximately one year before plaintiff became an investor. The defendants, for their part, argue

- 15 -

that plaintiff failed to prove a necessary element of fraud or fraudulent concealment, namely that there was an intention to mislead or defraud.

Under Vermont law, "[t]he elements of fraud or intentional misrepresentation are * * * as follows: * * * 'an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage.'" Silva v. Stevens, 589 A.2d 852, 857 (Vt. 1991) (quoting Union Bank v. Jones, 411 A.2d 1338, 1342 (Vt. 1980)). Fraudulent concealment, on the other hand, requires: "(1) concealment of facts, (2) affecting the essence of the transaction, (3) not open to the defrauded party's knowledge, (4) by one with knowledge and a duty to disclose, (5) with the intent to mislead, and (6) detrimental reliance by the defrauded party." Fuller v. Banknorth Mortgage Co., 788 A.2d 14, 16 (Vt. 2001). "A duty to disclose may arise 'from the relations of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge.'" Lay v. Pettengill, 38 A.3d 1139, 1144 (Vt. 2011) (quoting White v. Pepin, 561 A.2d 94, 96 (Vt. 1989)). "'In arm's-length transactions,' however, 'where facts are equally within the means of knowledge of both parties, neither party is required to speak, in the absence of inquiry respecting such matters.'" Id. (quoting White, 561 A.2d at 96).

Here, the trial justice found as fact that "all three of these principal parties, Wilby, Emmett and Savoie, met in an arm[']s-length mutual desire to make an investment that they thought would have the possibility of reaping great rewards * * * ." The trial justice further found that "at least on one occasion [Savoie] met with the owner of the track, nearby business persons with whom he developed some personal relationship, and was well aware of the situation involving the extent of the project of developing, rehabilitating and operating the race track

- 16 -

facility." The trial justice was "not impressed at all by the individual credibility of any of the principal witnesses, Langdon Wilby, Tammy Emmett, Marcus Vital[i] or Paul Savoie," finding that "each of these witnesses testified to their involvement in this case with a light to cast each of them in the most favorable position possible." The trial justice found "as a fact and as a matter of law that Mr. Savoie was a willing participant in the venture and that there was no material misrepresentation of fact or omissions of fact concerning Mr. Savoie's participation that were knowingly designed to induce him to invest $350,000."

Bearing in mind that "[a] trial justice's analysis of the evidence and findings in the bench trial context need not be exhaustive," we do not find merit in plaintiff's argument that the trial justice failed to adequately address his fraud claim. See Notarantonio, 941 A.2d at 144-45 (quoting McBurney, 875 A.2d at 436). After a thorough review of the record, we do not find any evidence of the intention to misrepresent or defraud that is required for a claim of intentional misrepresentation or fraudulent concealment under Vermont law. Accordingly, the trial justice had no need to address the issue of whether defendants owed a legal duty to disclose information about the racetrack venture before Savoie became an investor, because the intent element of the fraudulent concealment claim was clearly missing.[24] As for intentional misrepresentation, the trial justice made factual findings regarding Wilby's, Emmett's, and Savoie's pre-investment knowledge and behavior, and these findings comport with the conclusion that defendants did not intentionally mislead Savoie into believing that they had an interest in the racetrack property. We perceive no error in these factual findings. Accordingly, we affirm the trial justice's judgment on plaintiff's fraud claim.

---

[24] Nevertheless, the trial justice did find that this was an "arm[']s-length" transaction, which supports the finding that defendants did not owe a special duty to plaintiff.

- 17 -

## B

## Breach of Fiduciary Duty

The plaintiff argues that the trial justice erred by "declin[ing] to hold defendants responsible for * * * breaches of fiduciary duty." Specifically, plaintiff points to the evidence of payments made from the Green Mountain account to Wilby, Country Side Farms, and other third parties. The plaintiff also points to the evidence of "forgeries," referring to the checks that Vitali signed allegedly on plaintiff's behalf, and the loss of $62,000 from the final $100,000 that was invested through an unnamed broker. The plaintiff also notes various "managerial deficits," such as the fact that papers were never filed to allow Green Mountain to be treated as a small-business corporation for income tax purposes, and the failure to secure a written lease of the racetrack property. The plaintiff argues that the trial court erred by seemingly crediting this evidence of mismanagement and yet failing to hold defendants accountable to plaintiff for his resulting loss.

The plaintiff also argues that defendants were agents of the corporation, and that they had certain responsibilities as corporate fiduciaries due to their positions as officers. The plaintiff asserts that, as agents or fiduciaries, defendants had a duty to account for the corporation's assets and a duty to disprove a presumption of negligence created by dispensing the corporation's funds without proper documentation. Thus, plaintiff suggests that defendants had the burden of proving that the funds spent from Green Mountain's account were not misappropriated. The plaintiff asserts that the trial justice "let defendants off scot free, and instead faulted plaintiff for his inability to prove exactly how corporate funds were spent." The plaintiff maintains that this was legal error because, "[w]hen defendants failed to provide records to justify the expenditure of Green Mountain funds, including multiple thousands of dollars paid to themselves, they breached their fiduciary duty to account, making them liable for the unexplained expenditures."

The defendants, for their part, dispute plaintiff's contention regarding the trial justice's findings on the issue of fiduciary duty. The defendants assert that the trial justice "did not conclude as a finding of fact or conclusion of law that Defendants' actions constituted a breach of any fiduciary duty to Plaintiff." The defendants also claim that plaintiff's argument is not supported by the documentary evidence, such as Vitali's payment ledger, the checks paid from Green Mountain's account, and other documents that showed "the substantial time and effort invested by Defendants in the preparation of the [racing license application]."

Under Vermont law, "[d]irectors of a corporation are regarded as fiduciaries and are required to exercise their own independent judgment for the highest welfare of the corporation and its stockholders." Vermont Department of Public Service v. Massachusetts Municipal Wholesale Electric Co., 558 A.2d 215, 224 (Vt. 1988) (quoting Stoneman v. Fox Film Corp., 4 N.E.2d 63, 66 (Mass. 1936)). Shareholders of a corporation may bring suit against directors for breach of fiduciary duties owed to the corporation; and, under Vermont law, "[t]he general principles governing shareholder suits are well settled. In a derivative suit, the shareholder sues on behalf of the corporation for harm done to the corporation; in a direct action, the shareholder brings suit individually, or on behalf of a class of shareholders, for injuries done to them in their individual capacities." Bovee v. Lyndonville Savings Bank & Trust Co., 811 A.2d 143, 145 (Vt. 2002). "[A]ctions charging mismanagement which depress[ ] the value of stock [allege] a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action." Id. at 146 (quoting Kramer v. Western Pacific Industries, Inc., 546 A.2d 348, 353 (Del. 1988)). The Vermont Supreme Court has further held that "shareholders in a closely held corporation owe

one another a fiduciary duty of good faith and loyalty * * * ." P.F. Jurgs & Co. v. O'Brien, 629 A.2d 325, 331 (Vt. 1993).[25]

The plaintiff cites principles of agency law for the proposition that the burden of proof should have shifted to defendants, requiring them to show that they did not misappropriate Green Mountain's funds. In our opinion, this application of the law is misguided. Wilby and Emmett, as officers and directors of Green Mountain, were not agents of plaintiff; rather, they were agents of Green Mountain. The plaintiff here asserted his claim for breach of fiduciary duty directly on behalf of himself, not derivatively on behalf of the corporation; however, plaintiff cited no Vermont law suggesting that there would be a shift in the burden of proof in a direct suit for breach of fiduciary duty between co-shareholder-directors of a closely held corporation. We are satisfied, therefore, that the trial justice did not err by requiring plaintiff to prove misappropriation of corporate funds by a preponderance of the evidence.

Next, we address the issue of whether the trial justice found a breach of fiduciary duty and, if not, whether this finding was clearly erroneous. In his twenty-one-page decision, the trial justice acknowledged that Green Mountain "was extremely poorly run, without adhering to common reasonable business practices of accounting, tax filing and reporting, etc.," but found that Savoie was "well aware of the business venture and its pitfalls and possible reward." The trial justice also found as fact that Savoie had visited the racetrack more frequently than he admitted, and that he "was well aware of the situation involving the extent of the project of

_____

[25] The trial justice found that "[Green Mountain] was a closely held corporation," and this finding is not challenged on appeal. We assume, therefore, that plaintiff's claims were asserted against defendants for breach of their "fiduciary dut[ies] of good faith and loyalty" stemming from their positions as co-shareholders of a closely held corporation, see P.F. Jurgs & Co. v. O'Brien, 629 A.2d 325, 331 (Vt. 1993), rather than as claims for breach of fiduciary duties owed to the corporation and its stockholders stemming from defendants' capacities as directors. See Vermont Department of Public Service v. Massachusetts Municipal Wholesale Electric Co., 558 A.2d 215, 224 (Vt. 1988).

developing, rehabilitating and operating the race track facility." Further, the trial justice found that Savoie was aware that standards of corporate accountability were not being met, that Vitali was signing Savoie's name on checks drawn from the Green Mountain account, and that payments were being made to other third parties. While the trial justice was "dismayed at the lack of recordkeeping, accountancy and travel of the funds from the ledger book and checkbook," he was "not convinced by a fair preponderance of the evidence that these funds were misappropriated and put into anyone's pocket." Ultimately, the trial justice noted that while he was "aware of the corporate duties and the fiduciary duty of officers of corporations to their stockholders and shareholders, * * * in this particular instance * * * all three of these stockholders and directors were pretty much in the same boat * * * ."

After reviewing the trial justice's decision, we are of the opinion that he did not find that defendants breached any fiduciary duties owed to plaintiff. While the trial justice did list a litany of ways in which the corporation was poorly run, he explicitly stated that "Plaintiff has failed to prove by a fair preponderance of the credible evidence that the Defendants were negligent as to him and the operation of the corporation * * * ." Additionally, while the trial justice found the loss of $62,000 from the corporation's final $100,000 to be "extremely troublesome," he also found that, "[a]bsent any hard evidence as to where that money did go, the [c]ourt is without the ability to make a determination that it was embezzled or otherwise unjustly enriched by Wilby or Ms. Emmett."

After a thorough review of the record, we are satisfied that the trial justice did not overlook or misconceive material evidence and that his findings on the issue of fiduciary duty were not clearly erroneous. The record reveals that the testimonies of Wilby, Vitali, Emmett, and Savoie were replete with inconsistencies and vague recollections of even the most basic facts

surrounding Green Mountain's management. The witnesses' hazy presentations of the events certainly allowed for the conclusion that Savoie was more involved in the racetrack venture than he claimed. Additionally, the parties do not dispute that plaintiff was a member of Green Mountain's board of directors, that he willingly invested in the corporation despite cautionary advice from his financial-analyst brother, and that he failed to conduct even a cursory investigation into the corporation's prospective chances for success. We cannot say that the trial justice was clearly wrong in finding that defendants, while apparently ineffectual in their ability to rehabilitate the racetrack, breached any fiduciary duties owed to plaintiff, who also bore responsibilities as a corporate director and apparently failed to make any attempts to remedy the corporation's mismanagement. Accordingly, we affirm the trial justice's judgment on plaintiff's claim of breach of fiduciary duty.

## C

**Savoie's Knowledge of and Participation in the Mismanagement of Green Mountain**

Finally, plaintiff argues that the trial justice's factual findings were clearly wrong with regard to plaintiff's knowledge and participation in the mismanagement of the Green Mountain venture. First, plaintiff argues that he carried out only "menial tasks" at the racetrack and that "[t]hese activities would not even arguably have exposed plaintiff to defendants' record-keeping deficits or to the nature of the checks they were writing to themselves and others." According to plaintiff, the trial justice "acted unreasonably and without any evidentiary support" when he found that plaintiff "was well aware" of defendants' mismanagement of Green Mountain. Second, plaintiff argues that the trial justice was clearly wrong in finding that plaintiff and defendants, as stockholders and directors of the corporation, "were pretty much in the same boat." The plaintiff lists a litany of alleged differences between defendants and himself in

relation to their corporate capacities, including plaintiff's status as an inactive director, plaintiff's nonparticipation in spending corporate funds, and plaintiff's lack of responsibility for corporate recordkeeping. Third, plaintiff argues that the trial justice's conclusions regarding the parties' criminal records were clearly wrong. The plaintiff asserts that Wilby and plaintiff were not similarly situated with regard to the implications of their criminal records, because Wilby failed to disclose his record on Green Mountain's license application, whereas plaintiff was not involved in the application process.[26]

The trial justice laid out a detailed description of the facts underlying this case, and he noted the areas where the parties' versions of the facts diverged. He pointed out the distinction between Savoie's assertion that he visited the racetrack on only two or three occasions, and Wilby's and Vitali's assertions that Savoie "was a constant presence at the race track facility." The trial justice also noted the parties' disagreement over whether Savoie was ever an officer of the corporation and the lack of corporate paperwork to verify Savoie's status. He noted disagreement over how many corporate meetings were held with Savoie present, particularly the meeting where the decision was made to withdraw the license application. The trial justice also noted disagreement as to whether Savoie allowed Vitali to sign his name on corporate checks, as well as whether Savoie and Wilby were aware of each other's criminal records.

After detailing the discrepancies in the parties' various versions of the facts, the trial justice found that Savoie, "as a shareholder and director, even though he may not have been a

---

[26] The plaintiff notes that the trial justice erroneously stated that plaintiff had served a sixty-day sentence in the State of Nevada for "obtaining money under false pretenses," whereas plaintiff stated at trial that he had served a sixty-day sentence in the State of Vermont for a currency violation. The plaintiff also argues that the trial justice erred by noting that "Wilby denied withholding from plaintiff the contents of [Attorney] Foote's warnings," when in fact Wilby admitted that he did not disclose this information. We are of the opinion that the trial justice's misstatements as to these matters do not amount to clearly erroneous findings or misconceptions of material evidence.

director who was intricately involved in the development of this venture * * * was well aware of the business venture and its pitfalls and possible reward." The trial justice found that Savoie "knew that Marcus Vital[i] was running the operation in Vermont," and that Savoie's testimony "shad[ed] to his advantage the number of times that he was at that track." The trial justice also found that Wilby and Savoie did not inform each other of their criminal records.

As noted by the trial justice, the record of this case indicates that the parties presented diverging versions of the facts and that there was "a patent lack of recollection on the part of all of the main witnesses." In performing his duties of fact-finding in a nonjury trial, the trial justice necessarily weighed the credibility of the witnesses and selected what he found to be the most reliable version of the disputed facts. After careful review of the record, we are satisfied that the trial justice ably waded through this quagmire of faulty memories and opaque testimonies, and that he neither overlooked nor misconceived material evidence, nor were his factual findings clearly erroneous.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**         Langdon Wilby et al. v. Paul Savoie, Alias.

**CASE NO:**         No. 2012-141-Appeal.
(PC 02-2785)

**COURT:**         Supreme Court

**DATE OPINION FILED:**         March 12, 2014

**JUSTICES:**         Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**         Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**         Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Francis J. Darigan, Jr.

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Michael F. Horan, Esq.

For Defendant:  Daniel V. McKinnon, Esq.